**IN THE UNITED STATES DISTRICT COURT**
**FOR**
**THE MIDDLE DISTRICT OF ALABAMA**

THE UNITED STATES
   OF AMERICA

      vs.

CHRISTOPHER KENDELL RUSH

CRIMINAL ACTION NO.
2:07-Cr-178-WKW

VOLUME I OF II
1ST DAY OF
JURY TRIAL PROCEEDINGS

* * * * * * * * * *

HEARD BEFORE:    The Hon. W. Keith Watkins

HEARD AT:        Montgomery, Alabama

HEARD ON:        February 4, 2008

APPEARANCES:     Verne Speirs, Esq.
                 Matthew Shepherd, Esq.
                 Roianne H. Connor, Esq.

MITCHELL P. REISNER, CM, CRR
Official U. S. Court Reporter
Middle District of Alabama
(334) 265-2500

# T A B L E    O F    C O N T E N T S

**ITEM DESCRIPTION**                              **PAGE NO.**

Table of Contents ...........................    1

Title Page ..................................    2

Preliminary Discussion ......................    4

Pretrial Jury Charge
        by the Court .......................   18

Opening Statements
        by Mr. Speirs ......................   26

Scott Warren - Direct Examination
        by Mr. Shepherd ....................   35

Scott Warren - Cross Examination
        by Ms. Connor ......................   44

Timothy Kovacic - Direct Examination
        by Mr. Shepherd ....................   48

Timothy Kovacic - Cross Examination
        by Ms. Connor ......................   61

Timothy Kovacic - Redirect Examination
        by Mr. Shepherd ....................   64

Timothy Kovacic - Recross Examination
        by Ms. Connor ......................   64

Joseph Peterson - Direct Examination
        by Mr. Speirs ......................   65

Joseph Peterson - Cross Examination
        by Ms. Connor ......................   76

Joseph Peterson - Redirect Examination
        by Mr. Speirs ......................   77

Ronald McCoy - Direct Examination
        by Mr. Speirs ......................   82

1                    **T A B L E   O F   C O N T E N T S**

2

3       **ITEM DESCRIPTION**                                    **PAGE NO.**

4
        Ronald McCoy - Cross Examination
5            by Ms. Connor ........................... 95

6

7

8

9

10

11

12
        Court Reporter's Certificate ................. 105
13

14

15

16

17

18                           -o0o-

19

20

21

22

23

24

25

1  WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE
   HON. W. KEITH WATKINS ON FEBRUARY 4, 2008 AT THE UNITED
2  STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4                    PRELIMINARY DISCUSSION:

5           THE COURT: Ladies and gentlemen, I'm happy to have

6  you as a jury in this case.  I'm going to give you a lunch

7  break.  I'm first going to ask Ms. Roy to swear you in here,

8  and then I have an instruction to give you.  And after you

9  receive the instruction you can take a lunch break, and I

10 want you to be back downstairs in the jury assembly room at

11 one-fifteen.  No later than one-fifteen.  Okay?

12          So if y'all will stand, please, and be sworn.

13          (whereupon, the petit jury was duly by the

14 courtroom deputy clerk.)

15          THE COURT:  Ladies and gentlemen, be seated for

16 just a minute.

17          When you come back from lunch, we're going to start

18 with me introducing you to what the case is about, and then

19 the lawyers will argue and then we'll put on evidence.  We

20 may or may not finish the evidence today, but it's likely

21 that you'll have to come back tomorrow morning at least.  We

22 should be able to conclude the trial tomorrow, unless someone

23 gets sick or there is some unforeseen circumstance.

24          I'll give you this same charge every time you leave

25 out of here.  You'll probably get tired of hearing it, but

1    it's important.  It's critical to the way our system

2    operates.  And that is, you're not to discuss this case or

3    any aspect of it, anybody's testimony with anyone, including

4    yourselves, until I give you the case at the end of the

5    trial.

6            You're not to go to the scene or get on the

7    Internet and try to find out anything about anybody or even

8    about each other.  It's very important that this case is

9    decided from the evidence and from the law.  And the evidence

10   will come from over there, and the law will come from right

11   here.  And at the end of the trial you'll have them both, and

12   then it's all yours, and we just wait.  And we're working for

13   you.

14           So as you go to lunch you're not to discuss the

15   case or anything about it with anyone, and there won't be any

16   news reports probably, but you're not to read any should

17   there be any.  Don't get on the Internet, and have no

18   discussions, no information, all your information comes from

19   here in the courtroom.

20           So if you would, you have been sworn as the jury,

21   and be back downstairs, as I said, at one-fifteen ready to

22   come back up here.  Have a nice lunch.

23           If the parties will remain, please.

24           (Whereupon, the petit jury was escorted out of the

25   courtroom, and the following colloquy ensued):

1          THE COURT:  Now, if counsel and the defendant would

2    just approach here with the court reporter.

3          (Whereupon, the following bench conference was

4    held):

5          THE COURT:  We've got the marshals here.

6          Mr. Rush, you see the way I'm running the

7    courtroom?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  It's going to be run in a civil manner.

10   And are you comfortable with what we're doing here?

11         THE DEFENDANT:  Yes, sir, I am.

12         THE COURT:  Okay, good.

13         We'll give you every consideration we can under the

14   circumstances, and your lawyer's going to give you advice,

15   but you're the client and we'll talk later in the trial about

16   how that goes.  But I wanted to make sure you're comfortable

17   with everything that's going on.

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  All right.  Thank you.

20         You all have a nice lunch, and I'll see you back

21   here at one-fifteen to deal with whatever -- if there are

22   some motions that we need to deal with.

23         MR. SPEIRS:  The power point, Judge --

24         MS. CONNOR:  And the four oh four B.

25         THE COURT:  And there was something else.  Oh, the

```
 1   forfeiture.  Let's go ahead and do that right now.
 2              This case has a forfeiture allegation in it of a
 3   Rossi pistol and some ammunition.  I understand the parties
 4   have resolved that aspect of the case, and it will not need
 5   to go to the jury.
 6              Can the Government please state the resolution of
 7   it.
 8              MR. SPEIRS:  Your Honor, the parties have agreed
 9   that there is no ownership interest in that firearm.  I want
10   to stipulate ownership interest of the firearm.  And,
11   therefore, the Government would agree that it's contraband
12   property and should be forfeited per se, Judge.
13              THE COURT:  Okay.  And the defendant's position?
14              MS. CONNOR:  Your Honor, we do not own the gun.  We
15   don't know how the gun got in his car.  It wasn't his car.
16   Therefore, we have no legal claim to the gun or the
17   ammunition.
18              THE COURT:  Is your client prepared to sign
19   something so we can get this indictment out of the way, this
20   aspect of the indictment out of the away?
21              MS. CONNOR:  Yes.
22              THE COURT:  All right.  Well, then the forfeiture
23   allegation will be worked out, resolved between the parties
24   and it will not be an issue in the trial and will not be part
25   of the verdict form.
```

1          MR. SPEIRS:  Yes, sir.

2          THE COURT:  Now as far as the power point

3    presentation for the Government's opening, the defendant has

4    objected.  Would the defendant state your objection, please.

5          MS. CONNOR:  Your Honor, in the panels that we were

6    provided, it looks like he is going to present and talk about

7    the law.  The opening statement should just be what we expect

8    the evidence to present.  In the power point, he had

9    definitions of "possession," and he had some other legal

10   definitions.  And we would object to those portions of that

11   power point, because that's your job.

12         THE COURT:  Response?

13         MR. SPEIRS:  Your Honor, understanding that that is

14   the Court's responsibility, to instruct the jury on the law,

15   there are important legal concepts that the jury needs to

16   understand while they're listening to the evidence.  Such as

17   constructive possession or the different elements of

18   possession, and also the difference between circumstantial

19   and direct evidence.

20         Your Honor, these are legal principles that will

21   help the jury understand this case.  The Government has taken

22   advantage of the courtroom media, and in a number of cases

23   has almost all the gun cases that the Government has

24   presented in various trials has used a power point

25   presentation purely for the purpose of helping the jury

1    understand the facts and the law as it will be provided by

2    the judge.  In addition, Your Honor, these are direct

3    non-controversial statements of the law that the Government

4    would expect the Court to give at the close of all the

5    evidence.  And in fact, come from pattern jury instructions,

6    Your Honor.

7            THE COURT:  I've reviewed the power point

8    presentation, and I don't hear any objections to the -- that

9    the content is erroneous, that the evidence presented there

10   is not in fact is undisputed that the gun and the pictures of

11   the ammunition would be the gun, I suppose, in this case.

12   That is at issue in this case.  The law that is set forth is

13   -- consists of general statements of law that are correct.

14   Some of them in fact will be given in my opening and,

15   therefore, your objection will be overruled.  I'll allow the

16   power point to be used.

17           We will take up the four oh four B after lunch.  I

18   want to look at that a little bit more, and you want to talk

19   to your client about whether or he's going to testify or not?

20           MS. CONNOR:  Yes, sir.

21           MR. SPEIRS:  Your Honor, the Government has brought

22   with it in court today is Judge Thompson's decision in the

23   *Benny Dean Herring* case, should the Court want to take a look

24   at that particular opinion by Judge Thompson.

25           THE COURT:  I'll take a copy of it, if you don't

1    mind.

2              MS. CONNOR:  And, Your Honor, we, again, are

3    arguing that if the client does not take the stand, and that

4    this alleged incident happened months after the alleged

5    possession, we feel that it is more prejudicial than it is

6    probative.  And if he doesn't take the stand, we don't

7    believe that it should come in.

8              MR. SPEIRS:  And, Your Honor, one other thing.  It

9    appears, and the Government has sent a letter to counsel

10   regarding *United States vs. Oldchief*, which is regarding the

11   defendant's previous felony convictions.  The Government

12   intends to talk about those previous felony convictions

13   because they are an essential element of the crime, Title

14   Eighteen, United States Code, Section nine twenty-two G one.

15   The Government intends to discuss those as it sees fit,

16   because they are an essential element of the crime and the

17   defendant has not agreed to stipulate that he is a previously

18   convicted felon.

19             THE COURT:  And is that the defendant's position?

20   That you are not stipulating to his previous felony

21   conviction?

22             MS. CONNOR:  Your Honor, at this point the last

23   time I discussed this with my client the Government needed to

24   prove each and every element.

25             THE COURT:  Okay.  If that changes, I need to know

```
 1   it before opening argument.
 2           MS. CONNOR:  Yes, sir, I will talk with him right
 3   now.
 4           THE COURT:  Okay.  I'll address the four oh four B
 5   after lunch.  I do want to read the Benny Herring case.  But
 6   that doesn't necessarily mean I'm going to rule right after
 7   lunch.  I may want to hear how the evidence comes in, and
 8   when it comes up I may rule on it how when it comes up.
 9   We'll just have to see.
10           MR. SPEIRS:  Yes, sir.
11           THE COURT:  See you all back here in an hour.
12           (Whereupon, the luncheon recess was taken.)
13           THE COURT:  How much time does the Government want
14   for opening?
15           MR. SPEIRS:  I don't think the opening should last
16   more than about ten or twelve minutes, Judge.
17           THE COURT:  Okay.  Take fifteen minutes, then, if
18   you need it.
19           And for the defendant?
20           MS. CONNOR:  Fifteen at the most.
21           THE COURT:  All right.
22           All right.  Let me see here.  I want to keep a
23   special eye on the time of this case because tomorrow is
24   voting day, and we need to coordinate.  That way my hope
25   would be that we could get the case to the jury in the
```

```
 1    morning so the afternoon would be available perhaps to them.
 2              You have someone at the table that the Government
 3    hasn't introduced earlier today?
 4              MR. SPEIRS:  I think she was introduced.  We
 5    qualified her as Ms. Carolyn Hudson.
 6              THE COURT:  Yeah, okay.  She's out of your office?
 7              MR. SPEIRS:  Yes, sir.
 8              THE COURT:  Is Officer Green, or whoever, is going
 9    to sit with you?
10              MR. SPEIRS:  He is.  As soon as Ms. Hudson is done,
11    he's going to rejoining us back at the table.
12              THE COURT:  Okay.  All right.  On this four oh four
13    B evidence, I'm going to withhold ruling on that but I'll
14    tell you my concerns.  I have read the cases.  The United
15    States vs. Herring out of this district.  The Gomez case, and
16    the Cassell, C-a-s-s-e-l-l case.  Here, as I understood it,
17    we have a neighbor after the offense is charged but before
18    indictment on this offense who identifies or is purportedly
19    able to identify this defendant as having in his possession a
20    handgun and making a statement about the handgun.
21              If I allow the evidence in at all, the statement
22    will not come in and the evidence would come in with an
23    instruction for that limited purpose.  The Court is concerned
24    that the episode happened after the charged offense rather
25    than before, and is considering the effect that circumstance
```

1    might have on the issue of intent.  The Court wants to hear

2    how the evidence unfolds as to whether lack of knowledge is a

3    defense as opposed to lack of intent, which is closely

4    related.

5            And the Court is also concerned that *Herring* -- in

6    *Herring* Judge Thompson made a deal out of it not being a

7    prior conviction but that the extrinsic evidence was offered

8    by a policeman who made a traffic stop, and that the

9    implication was that it was -- he said, however, if an

10   officer testifies regarding the circumstances of the arrest

11   or in this case the traffic stop, this testimony would be

12   sufficient to meet the lenient reasonable jury standard that

13   the prior act occurred.  *Cassell* seems to be talking about

14   prior crimes, as does *Gomez*.

15           So the Court wants to hear how the testimony comes

16   out and what the defenses or implications of defenses would

17   be.  Those are my concerns in weighing the probative value as

18   opposed to the prejudicial value under four oh three or the

19   potential for prejudice under four oh three.

20           Similarity of the offenses is one of the issues

21   that Judge Thompson raised as well.  There was no --

22   technically no offense that I'm aware of in the incident with

23   the neighbor.

24           MR. SPEIRS:  Your Honor, she did go out to the

25   police department and swear out a menacing warrant.  So I

1    guess to the extent there is an offense, it would be

2    menacing.

3            THE COURT:  But there was no conviction or

4    acquittal to your knowledge?

5            MR. SPEIRS:  Not to my knowledge.

6            MS. CONNOR:  Judge, there has been no adjudication

7    at all.

8            MR. SPEIRS:  I believe that's correct.

9            THE COURT:  Is there a pending case?

10           MR. SPEIRS:  Not that I'm aware of.

11           MS. CONNOR:  Not that I'm aware of, Your Honor.

12           THE COURT:  All right.  Those are some of the

13   issues.

14           Ms. Connor, you were standing.  Did you want to

15   address --

16           MS. CONNOR:  Well, Your Honor, the only thing that

17   I would like to bring to the Court's attention again is, this

18   was just an allegation as far as we knew.  There has been no

19   charge, no adjudication, and I believe it goes that this

20   happened in April.  The alleged -- The deposition states the

21   twelfth of August and the indictment was stamped the

22   fifteenth of August.  So I believe that's the timetable.

23           THE COURT:  Okay.

24           MR. SPEIRS:  Your Honor, if the Government might

25   just -- If the defendant does take the stand, and I believe

1    the Government has a good faith basis that perhaps ask him

2    about that incident and then perhaps Ms. Garner as a

3    rebuttal, Judge, I think there might be different

4    opportunities to deal with this evidence.  So I just wanted

5    to lay that out and get your feel for it, Judge.

6              MS. CONNOR:  Your Honor, I have been informed since

7    the lunch break that my client will not be taking the stand.

8              THE COURT:  Okay.  Mr. Rush, your attorney has

9    indicated you will not be taking the stand.  And you know

10   that you have the right to take the stand, is that correct?

11             THE DEFENDANT:  Yes, sir, I do.

12             THE COURT:  And you discussed that with your

13   attorney?

14             THE DEFENDANT:  Yes, sir, I have.

15             THE COURT:  And you're going to take her advice in

16   this matter?

17             THE DEFENDANT:  Yes, sir, I will.

18             THE COURT:  All right.  That was the circumstance I

19   was not going to ask for, but that's the circumstance that

20   certainly relates to this and so I'm going to withhold ruling

21   and instruct you not to address it in your opening at this

22   time.  If it comes out in evidence, it will come out.  I

23   didn't see anything in your power point presentation.

24             MR. SPEIRS:  No, sir, is it not there.

25             THE COURT:  All right.  Anything else the Court

1    needs to take up before bringing the jury?

2                MR. SPEIRS:  Not from the Government, Your Honor.

3                MS. CONNOR:  Not from the defendant, Your Honor.

4                THE COURT:  We've stipulated that forfeiture is not

5    an issue.

6                Is there a required document from your standpoint,

7    from the Government's standpoint on that?

8                MR. SPEIRS:  Your Honor, I don't believe that there

9    is.  As long as both parties agree that forfeiture is not an

10   issue, and with Mr. Harmon having retired as of Thursday, I

11   don't have anybody that I can call offhand to ask about that,

12   Judge, but it's been my experience that if both parties agree

13   that it's no longer an issue, my understanding is the firearm

14   would just be -- there would either be general publication or

15   it would be destroyed.

16               MS. CONNOR:  Your Honor, it's been my experience in

17   the last two that I've tried that Mr. Harmon brought over an

18   order or a motion.  We all signed it saying we had no

19   standing and no objection, and then Judge Thompson signed the

20   order.

21               THE COURT:  Can the Government resolve this

22   tonight?

23               MR. SPEIRS:  We certainly will, Judge.

24               THE COURT:  All right.  Before tomorrow.

25               MR. SPEIRS:  We will do that, Your Honor.

```
 1              THE COURT:  Are you invoking the rule?

 2              MS. CONNOR:  Yes, sir.

 3              THE COURT:  Okay.  You can bring the jury in.

 4              MR. SPEIRS:  Yes, sir.

 5              (Whereupon, the jury was escorted into the

 6   courtroom.)

 7              THE COURT:  Ladies and gentlemen, you may be

 8   seated.

 9              I'm going to give you my general opening

10   instructions here in just a moment, but I wanted to let you

11   know that we'll be taking breaks from time to time.  From

12   time to time, and you'll hear this in my formal charge to

13   you, but from time to time I have to take up things outside

14   your presence.  You, if you have medical problems or any kind

15   of an issue of comfort that's important, then you need to let

16   me or Ms. Roy know.  If medical issues come up, you need to

17   let us know that.

18              We're aware that tomorrow is voting day, and we're

19   going to try to take every precaution to either get the case

20   over with before noon or let you come in late, depending on

21   how things go.

22              What's the farthest distance anybody drives?  I

23   know we have some from Troy.  Is anybody further than an hour

24   away?

25              JUROR:  I think I'm a little bit over an hour away.
```

```
1              THE COURT:  Okay.  Anybody further than that?
2              (No response.)
3              THE COURT:  Okay.  All right, ladies and gentlemen.
4                        PRETRIAL JURY CHARGE:
5              THE COURT:  Members of the jury, you have now been
6    sworn as the jury to try this case.  By your verdict you will
7    decide the disputed issues of fact.  I will decide all
8    questions of law that arise during the trial, and before you
9    retire to deliberate together and decide the case at the end
10   of the trial I will instruct you on the rules of law that you
11   must follow and apply in reaching your decision.
12             Because you will be called upon to decide the facts
13   of the case, you should give careful attention to the
14   testimony and evidence presented for your consideration
15   during the trial, but you should keep an open mind and should
16   not form or state any opinion about the case one way or
17   another until you've heard all of the evidence and have had
18   the benefit of the closing arguments of the lawyers as well
19   as my instructions to you on the applicable law.
20             During the trial you must not discuss case in any
21   manner among yourselves or with anyone else, and you must not
22   permit anyone to attempt to discuss it with you or in your
23   presence.  And insofar as the lawyers are concerned, as well
24   as others whom you may come to recognize as having some
25   connection with the case, you are instructed that in order to
```

1    avoid even the appearance of impropriety you should have no

2    conversation whatever with those persons while you're serving

3    on the jury.

4           You must also avoid reading any newspaper articles

5    that might be published about the case now that the trial has

6    begun, and you must also avoid listening to or observing any

7    broadcast news program on either television or radio because

8    of the possibility that some mention might be made of the

9    case during such a broadcast now that the trial is in

10   progress.

11          The reason for these cautions of course lies in the

12   fact that it will be your duty to decide this case only on

13   the basis of the testimony and evidence presented during the

14   trial without consideration of any other matters whatever.

15          Now in order that you might better understand at

16   the beginning of the case, the nature of the decision that

17   you'll be asked to make and how you should go about making

18   them, I'd like to give you some preliminary instructions at

19   this time concerning some of the rules of law that will

20   apply.  Of course the preliminary instruction that I'll give

21   you now will not cover all the rules of law applicable to

22   this case.  As stated before, I will instruct you fully at

23   the end of the trial just before you retire to deliberate

24   upon your verdict.  I will probably restate at that time some

25   of the rules I want to tell you about now.

1           In any event, you should not single out any one

2   instruction alone as stating the law, but you should consider

3   all of my instructions as a whole.

4           As you were told during the process of your

5   selection, an indictment in a criminal case is merely the

6   accusatory paper which states the charges to be determined at

7   the trial, but it is not evidence against the defendant or

8   anyone else.  Indeed, the defendant has entered a plea of not

9   guilty and is presumed by law to be innocent.  The Government

10  has the burden of proving a defendant guilty beyond a

11  reasonable doubt, and if it fails to do so you must find the

12  defendant not guilty.

13          "Proof beyond a reasonable doubt" is proof of such

14  a convincing character that you would be willing to rely and

15  act upon it without hesitation in the most important of your

16  own affairs.  Because the Government has the burden of proof

17  it will go forward and present its testimony and evidence

18  first.  After the Government finishes or rests, what we call

19  its "case-in-chief," the defendant may call witnesses and

20  present evidence if it wishes to do so; however, you will

21  remember that the law does not require a defendant to prove

22  his innocence or produce any evidence at all.  And no

23  inference whatever may be drawn from the election of the

24  defendant not to testify in the event he should so elect.

25          As you listen to the testimony you should remember

1    that you'll be the sole judges of the credibility or

2    believability of each witness and the weight to be given to

3    his or her testimony.  In deciding whether you believe or

4    disbelieve any witness, you should consider his or her

5    relationship to the Government or to the defendant.  The

6    interest, if any, of a witness in the outcome of the case,

7    his or her manner of testifying, the opportunity of the

8    witness to observe or acquire knowledge concerning the facts

9    about which he or she is testifying, the candor, fairness and

10   intelligence of the witness, and the extent to which the

11   witness has been supported or contradicted by other credible

12   evidence.

13          You may, in short, accept or reject the testimony

14   of any witness in whole or in part.

15          Now you notice that the court reporter is taking a

16   complete stenographic record of all that is said during the

17   trial, including the testimony of the witnesses.  In case it

18   should become necessary at a future date to prepare printed

19   transcripts of any portions of the trial's proceedings, such

20   transcripts, however, if prepared at all will not be printed

21   in sufficient time or appropriate form for your review during

22   your deliberations.  And you should not expect to receive any

23   transcripts.  You will be required to rely upon your own

24   individual and collective memory concerning what the

25   testimony was.

1          On the other hand, any papers or other tangible

2     exhibits received in evidence during the trial will be

3     available to you for study during your deliberations.  On

4     some occasions during the trial an exhibit will handed for

5     your inspection there in the jury box.  Others will not be

6     shown to you.  But do not be concerned, because as I said,

7     you will get to see and inspect at the end of the case all of

8     the exhibits that are received in evidence.

9          Now you have your notebooks.  You will be permitted

10    to take notes during the trial if you want to, and the clerk

11    has provided notebooks and pens for each of you.  On the

12    other hand, of course, you're not required to take notes.

13    And if you do not want to, that will be left up to you

14    individually.

15         If you do decide to take notes be careful not to

16    get so involved in note-taking that you become distracted

17    from the ongoing proceedings.  Don't try to summarize all of

18    the testimony.  Instead, limit your note-taking to specific

19    items of information that might be difficult to remember,

20    such as dates, times, amounts, measurements or identities and

21    relationships.  But remember that you must decide upon the

22    credibility or believability of each witness, and you must

23    therefore observe the demeanor and appearance of each witness

24    while testifying.  Note-taking must not distract you from

25    that task.

1           Also, your notes should be used only as aids to

2    your memory, and whether you take notes or not you should

3    rely on your own independent recollection or memory of what

4    the testimony was, and should not be unduly influenced by the

5    notes of other jurors.  Notes are not entitled to any greater

6    weight than the recollection or impression of each juror as

7    to what the testimony was.

8           Tonight, when you leave, you'll leave -- any time

9    you'll leave the courtroom you'll turn your notepad upside

10   down, write your name on the back for the first time and

11   leave it in your chair and come back to it.  You'll leave it

12   here tonight, and when you leave tomorrow you'll take no

13   notes with you.  The notes stay here and are destroyed by Ms.

14   Roy.

15          At this time I'll explain the indictment which

16   charges that on or about the twenty-fourth day of April, two

17   thousand seven the defendant, Christopher Kendell Rush,

18   having previously been convicted of a felony, knowingly and

19   willfully possessed a firearm in and affecting commerce, that

20   is a Rossi model M sixty-eight thirty-eight caliber revolver

21   and ammunition in violation of federal law.

22          In order to establish that offense the Government

23   must prove beyond a reasonable doubt each of the following

24   essential elements.  First, that the defendant knowingly

25   possessed a firearm or ammunition in or affecting interstate

1    commerce as charged; and, second, that before the defendant

2    possessed a firearm or ammunition, the defendant had been

3    convicted in a court of a crime punishable by imprisonment

4    for a term in excess of one year, that is a felony offense.

5         The word "knowingly," as that term has been used in

6    the indictment and in my instructions, means that the act was

7    done voluntarily and intentionally and not because of mistake

8    or accident.

9         As I said, at the end of the trial I'll charge you

10   more fully on the law, but that's the general outline of the

11   law we'll be working with.

12        From time to time during the trial I may be called

13   upon to make rulings of law on motions or objections made by

14   the lawyers.  You should not infer or conclude from any

15   ruling that I may make that I have any opinions on the merits

16   of the case favoring one side or the other.  And if I sustain

17   an objection to a question that goes unanswered by a witness,

18   you should not speculate on what answer might have been

19   given, nor should you draw any inferences or conclusions from

20   the question itself.

21        During the trial it may be necessary for me to

22   confer with the lawyers from time to time out of your hearing

23   concerning questions of law or procedure that require

24   consideration by the Court alone.  On some occasions you may

25   be excused from the courtroom as a convenience to you and to

1    us while I discuss those matters with the lawyers.  I'll try

2    to limit such interruptions as much as possible, but you

3    should remember at all times the importance of the matter you

4    are here to determine, and should be patient, even though the

5    case may seem to go slowly.

6            In that regard, as you were told during the process

7    of your selection we expect the case to last not more than

8    two days, but I'll make every effort to expedite the trial

9    whenever possible.

10            Now we will begin by affording the lawyers for each

11   side an opportunity to make an opening statement.  In opening

12   statement they may explain the issues in the case and

13   summarize the facts they expect the evidence will show.

14   After all the testimony and evidence has been presented, the

15   lawyers will then be given another opportunity to address you

16   at the end of the trial and make their summations or final

17   arguments in the case.

18            The statements that the lawyers make, as well as

19   arguments they present at the end of the trial, are not to be

20   considered by you either as evidence in the case, which comes

21   only from the witness stand and the exhibits, or as your

22   instructions on the law which comes only from me.

23   Nevertheless, these statements and arguments are to help you

24   understand the issues and the evidence as it comes in, as

25   well as the positions taken by both sides.

1          So I ask that you now give the lawyers your close

2     attention, and I recognize the Government's lawyer first for

3     the purpose of making an opening statement.

4          Mr. Speirs?

5                         OPENING STATEMENTS:

6          MR. SPEIRS:  May it please the Court.

7          Good afternoon, ladies and gentlemen.  We probably

8     got to know each other a little bit during jury selection,

9     but let me take this opportunity to real quick introduce

10    myself again.  My name is Verne Speirs, and I'm a federal

11    prosecutor, an Assistant United States' Attorney.  Seated at

12    counsel table with me is Matthew Shepherd, who is also an

13    Assistant United States' Attorney.  And this is Carolyn

14    Hudson.  She's going to make sure that if any of this stuff

15    crashes, I'm going to get out of trouble.  Okay?

16         So this is the *United States vs. Christopher Rush*.

17    Now before we get into the details of the case of what

18    happened, there's a couple of things you need to know about.

19    That mainly is it is a violation of federal law for anyone

20    who has been convicted of a felony offense to possess a

21    handgun, a long gun or a single solitary bullet.  If you have

22    a felony offense, you can't have any of that stuff.  No

23    handguns, no long guns, not even a bullet.  And that Congress

24    codified that under Title Eighteen United States Code,

25    Section nine twenty-two G one.  And that's been the law since

1    about nineteen sixty-eight.  It's called the felon in

2    possession of a firearm, and it's against federal law.

3           Well this case is about the defendant, Mr. Rush.

4    It's the Government's contention that Mr. Rush is indeed a

5    convicted felon.  Indeed, we expect the evidence to show that

6    he has previously been convicted of kidnapping in the second

7    degree, and also that he's been convicted of theft of

8    property in the first degree in the mid nineties here in

9    Montgomery County.  As a result of those convictions, he

10   cannot have a handgun, he cannot have a long gun, and he

11   cannot have a single solitary bullet.

12          So the issue in this case revolves around this

13   particular gun that you see on the screen in front of you.

14   That's a Rossi thirty-eight caliber pistol.  Now on the other

15   side of the screen you see twelve thirty-eight caliber

16   rounds.  Okay?  That's where we're going to spend most of the

17   time on this case, is talking about his knowing possession of

18   that gun and that ammunition.

19          Well, what happened?  On April twenty-fourth of two

20   thousand seven there was just a routine traffic stop here in

21   Montgomery.  Mr. Rush was not driving.  He was a passenger in

22   a car that was being driven by a gentleman by the name of Mr.

23   Mica Davis.  Okay?  The taillight was broken out so the

24   police officer stopped the car.  Mr. Davis had some capias

25   warrants out for him, failures to appear to court here in

1    Montgomery County, and there was also a female that was in

2    the back of the car and our defendant was in the passenger

3    side of the car.

4            The officers went around to talk to him.  And

5    you'll hear testimony from these, M. P. D. officers that they

6    noticed he started to get really nervous.  And I also expect

7    the evidence to be that he gave a false name to the police

8    officers on more than one time.  And finally, once they got

9    him out of the car, he went to run.  Okay?

10           So what happened was, that the police officers

11   chased him down.  They were able to capture him.  They found,

12   and you'll see on your hand on the bullets they found five

13   expended shell casings in his back pocket when they actually

14   captured him.  They took him back to the car where he had run

15   from, and they found that Rossi thirty-eight that was there

16   in the glove compartment that would have been right in front

17   of him, and they also found some of those bullets were in the

18   gun and some were under the seat.

19           So I'm not sure what Miss Connor is going to say.

20   But she may say something like this.  The Government is not

21   going to present a single law enforcement witness that's

22   going to say they saw the defendant with the gun or the

23   bullets in his hand.  Live rounds and an actual gun.  And

24   she'd be absolutely right about that.  Okay?  There's not

25   going to be a law enforcement witness that comes in and says

1   I saw him holding a gun. We're not going to have that. All

2   right? But there are some things you need to recognize about

3   the law that will address those issues.

4         The law recognizes four different types of

5   possession. And the law doesn't draw any distinction between

6   these different types of possession. The first one is

7   actual. I'm in "actual possession" of this little clicker

8   right here. I can do anything I want to with it. I can

9   throw it across the room, drop it on the floor, whatever it

10   takes.

11         "Constructive possession" is if I put it down, I

12   know where it is, I can go over and talk to my colleagues, or

13   perhaps go talk to the judge, but I have the power and the

14   intent to take control of it any time I want. And it's much

15   like the things that you all have in your house right now.

16   You're not at home, but you still possess all of the items

17   that are either in your house or in your car. That's call

18   "constructive possession". And this is a constructive

19   possession case, that he had the power and intent to take

20   control of the ammunition, the live ammunition and the gun

21   that was found there in the car.

22         There's "joint possession" where if I get someone

23   else to hold this with me at the same time, then we might be

24   in joint possession of it. And then there is also "sole

25   possession" where on I am in possession of this. And I think

1    actual and sole possession are kind of the same, but the

2    important part is that there are four different kinds, and

3    the law does not draw any distinction among them, okay?

4    There is no difference.

5            In addition to that, there is "direct" and

6    "circumstance evidence".  And I chuckle when I talk about

7    direct and circumstantial evidence because my wife loves to

8    watch C. S. I. and a lot of these television shows about

9    police officers.  There is inevitably some guy who wants to

10   disparage the Government's case by saying well, it's only

11   circumstantial case.  I chuckle at that because there is no

12   difference.  There is no difference between direct evidence

13   and circumstantial evidence.

14           A good example of that is, let's say it snows

15   tonight.  Okay?  You go to bed and you're with the kids and

16   you're looking out, the snow is falling.  In the morning you

17   wake up and you see rabbit tracks going through the snow.

18   You didn't see the rabbit, but there are his tracks.  That's

19   circumstantial evidence.  Okay?

20           "Direct evidence" is if you saw the rabbit.  Now

21   there is no difference between seeing the tracks in the snow

22   and seeing the rabbit.  They're direct and circumstantial

23   evidence, and the law gives equal weight to both.  Okay?

24           So what is it that the Government has to prove to

25   y'all?  First, we have to prove that he's a convicted felon.

1    And we will have documents showing his previous felony

2    convictions.  You'll hear from an expert that compared his

3    prints for the kidnapping and also for the theft.  Okay?  We

4    have to prove that he knowingly possessed the firearm and

5    ammunition, and I expect that's what we'll spend most of our

6    time talking about that.  And, finally, that the firearm and

7    ammunition moved across a state line.  That's what gives the

8    Federal Government jurisdiction in this case.  It's called

9    "interstate nexus," and there will be an A. T. F. agent who

10   will come, look at the gun, look at the ammunition and I

11   expect him to say that those things moved across the state

12   line at some point.  And that's why the Federal Government

13   has jurisdiction over felons in possession of a firearm.

14           Finally, ladies and gentlemen, what do we expect?

15   All we expect is that you listen to the testimony carefully.

16   Okay?  You use your common sense.  You weigh the evidence and

17   you return the verdict that the evidence supports.  And in

18   this case it's going to be a verdict of guilty.

19           Thank you.

20           THE COURT:  Ms. Connor?

21                     OPENING STATEMENTS:

22           MS. CONNOR:  If it please the Court?

23           Ladies and gentlemen of the jury, I'm Roianne

24   Holton Connor.  I practice here in Montgomery.  We met during

25   jury selection.

1          It's my honor to represent Mr. Christopher Kendell

2   Rush.  And also seated at counsel table is Beau Alford.  As I

3   told y'all in opening, Beau is an attorney in training.  Has

4   a license, but he's trying to learn the ins and outs, and so

5   he will not be speaking, he won't be cross-examining, but he

6   will be sitting there observing us and taking notes.

7          It's my honor to represent Kendell Rush.  The

8   Government has charged Chris with being an ex-felon and

9   knowingly possessing a firearm.  This Court told y'all in the

10  opening instructions that Chris, as he sits right there right

11  now, is innocent.  He is cloaked with the presumption of

12  innocence.  The Government has the obligation in our system

13  to present evidence that they believe would thread by thread

14  take the cloak of innocence that Christopher has and take it

15  away.  I tell you, ladies and gentlemen, that they can't do

16  that.  This presumption of innocence is a piece of evidence.

17         The judge has also told you that as he sits there,

18  Chris does not have the obligation one to testify, or two, to

19  put on any evidence.  And you, ladies and gentlemen of the

20  jury, have sworn to us that you will not hold that against

21  him.  We have no burden of proof.  None whatsoever.  The

22  burden of proof totally rests with Mr. Speirs.

23         Mr. Speirs and I have been doing this a long time,

24  and he knows practically what I'm going to stand up here and

25  say.  He gave you the elements.  And Verne is right, those

1    three elements are the elements that they have got to prove

2    in order to prove Chris guilty.  However, we are telling you

3    that they cannot prove that he knowingly possessed this

4    firearm.

5            The evidence will show to you, ladies and

6    gentlemen, that he has gotten in a car as a passenger.  It

7    wasn't his car.  He wasn't driving.  He was not in control.

8    He was riding in this car with his future father-in-law, Mica

9    Davis, to go get some beer.  They got pulled over.

10   Mr. Davis, unfortunately, had some capias warrants for unpaid

11   tickets, I believe.  They go arrest Mr. Davis and put him in

12   the police car.

13           Chris, unfortunately, has had some run-ins with the

14   law.  Chris is scared.  Chris doesn't know what may or may

15   not be in that car.  So what does Chris do?  He gives them

16   his brother's name.  He also runs.  He does.  And they catch

17   him.  When the police department searches the automobile,

18   they find a firearm in the car.

19           They find ammunition in the car.  But never, ever

20   will you hear from that stand any evidence whatsoever that

21   Chris Rush's fingerprints were found on that gun.  You will

22   never hear evidence that fingerprints were found on the

23   bullets, or on the casings.  That evidence is not coming in

24   because there is no evidence that Chris Rush's fingerprints

25   were on the gun or the bullets.  If there were, we wouldn't

1   be here.

2           You have the no evidence, and will have no

3   evidence, that anyone saw Chris Rush with a gun in his hand,

4   or with the ammunition in his hand, because it didn't happen,

5   ladies and gentlemen.

6           Verne talked about possessions.  Actual possession,

7   constructive possession, joint possession, sole possession

8   like he's giving you all a law school lecture.  I know that

9   we have a lawyer here, and the mother of a lawyer here.  The

10  different types of the possessions is important, and under

11  the law Verne is right, those types of possessions are all

12  under our law.  But in order to have even a constructive

13  possession, our rabbit going across the snow, you've got to

14  know that the gun was there.

15          You've got to know that, you know, you're not

16  supposed to be there with the gun.  Chris Rush had no

17  knowledge that the gun was there.  Therefore, without any

18  evidence whatsoever, your only verdict can be not guilty.

19          Thank you, Your Honor.

20          THE COURT:  Mr. Speirs, call your first witness.

21          MR. SHEPHERD:  Your Honor, the Government calls

22  Officer Scott Warren.

23                  S C O T T      W A R R E N,

24      the witness herein, having first been duly sworn or

25  affirmed to tell the truth, was examined and testified as

```
 1    follows:

 2                         DIRECT EXAMINATION

 3                 BY MR. SHEPHERD OF SCOTT WARREN:

 4          THE COURT:  Good afternoon.

 5          THE WITNESS:  Good afternoon, sir.

 6    Q.  Good afternoon.

 7          Would you please state your full name for the

 8    record.

 9    A.  Steven Clay Warren.

10    Q.  And where do you currently work?

11    A.  Montgomery Police Department.

12    Q.  And how long have you been with the Montgomery Police

13    Department?

14    A.  Almost five years.

15    Q.  And do you have any other law enforcement experience

16    besides with the Montgomery Police Department?

17    A.  No, sir, I do not.

18    Q.  And what kind of training do you have prior to becoming a

19    police officer?

20    A.  None.

21    Q.  Are you a graduate of any police academies?

22    A.  Montgomery Police Academy.

23    Q.  And what's your current duty with the Montgomery Police

24    Department?

25    A.  I'm assigned to third shift patrol.
```

1   Q.   And as a patrol officer what kinds of things do you do?

2   A.   Answer calls, ride around checking businesses, doing

3   traffic stops.   Just basically protect and serve.

4   Q.   And you say you work third shift.   What hours are

5   those?

6   A.   From eight p.m. to seven a.m.

7   Q.   Were you working on April twenty-fourth of two thousand

8   and seven?

9   A.   Yes, sir.

10  Q.   And what shift were you on that night?

11  A.   Third shift.

12  Q.   Was anyone with you in your vehicle?

13  A.   Yes, sir, my partner, Officer Kovacic.

14  Q.   Are you able to spell that for the court reporter?

15  A.   Not exactly.

16          COURT REPORTER:   I have it here, Mr. Shepherd.

17  Q.   That's okay, Officer Warren.   I'll take care of that with

18  the court reporter later.

19          As you were driving around that night on patrol

20  with Officer Kovacic, did you have to make a traffic stop on

21  a car driven by Mica Davis?

22  A.   Yes, sir, I did.

23  Q.   Could you please describe what the basis for that stop

24  was?

25  A.   We were on routine patrol.   We observed a green Chevrolet

1    Malibu traveling eastbound on West Fairview with a broken

2    taillight.

3    Q.   What did you do then, after you observed the vehicle --

4    A.   We pulled the vehicle over in the parking lot the Petro

5    (ph.) Mart.

6    Q.   Officer Warren, if you would speak as slowly as possible

7    so the court reporter can hear what you're saying.

8    A.   I'm sorry.

9    Q.   When you pulled over the vehicle at the Petro Mart, what

10   happened then?

11   A.   I then -- We then got out and made contact with the

12   driver, Mr. Davis.  I asked him for his driver's license.

13   Explained to him why I pulled him over.  He stated that he

14   didn't have a driver's license.  He gave me his name and date

15   of birth and his Social Security number.

16   Q.   Were there any passengers in the vehicle with

17   Mr. Davis?

18   A.   Yes, sir, there were.  There was another black male and a

19   black female in the rear passenger seat.

20   Q.   And could you just go over again where the passengers

21   were sitting in the vehicle?

22   A.   Mr. Davis was driving the vehicle.  Mr. Rush was sitting

23   in the front passenger seat.  And the black female,

24   Miss Williams, was in the rear.

25   Q.   You just identified Mr. Rush as sitting in the front

1  passenger seat.  Do you see that passenger in the courtroom

2  today?

3  A.  Yes, sir.

4  Q.  Would you please describe what he's wearing and where

5  he's sitting?

6  A.  He's sitting in between the lady and the man.  He's

7  wearing a blue shirt with a blue tie.

8      MR. SHEPHERD:  Your Honor, we would request the

9  record to reflect that the witness has identified the

10  defendant as the passenger in the vehicle stopped.

11      THE COURT:  So noted.

12  Q.  Officer Warren, what was your partner doing when you were

13  getting this information from Mr. Davis?

14  A.  He was staying on the passenger's side of the vehicle,

15  keeping an eye on the occupants.

16  Q.  Did you do anything with that information from Mr. Davis

17  one you received it?

18  A.  Yes, sir, I did.

19  Q.  What did you do?

20  A.  I went back to my vehicle and ran a license check on him

21  and Mr. Rush.  Mr. Davis came back revoked, and also had

22  eleven outstanding capias warrants with the City.

23  Q.  Did you obtain any identifying information from Mr.

24  Rush?

25  A.  I asked him for a license, and he said he didn't have one

1  with him but he had one.  He gave me his name and a date of

2  birth and a Social.  I ran that information through the N. C.

3  I. C.  It came back "Not on file."  I immediately turned

4  around and ran it again.  Made sure that I didn't enter

5  anything incorrectly.  It still came back "Not on file."

6  Q.  What name did he give you?

7  A.  He gave me the name of Russell Rush, Junior.

8  Q.  And is that the name that you then checked against N. C.

9  I. C.?

10  A.  Yes, sir, that's the name I ran along with the date of

11  birth and Social that he provided.

12  Q.  And just so the jury understands, what is "N. C. I. C."?

13  A.  It's a computer system that we use to check tags, to

14  check for warrants and to make sure the license is current.

15  It's a nationwide system.

16  Q.  What did you do after finding that the name he gave you

17  wasn't in the system?

18  A.  I ran it again, two or three times again just to make

19  sure I put in all the information correctly, which is

20  something I do every time it comes back "Not on file."

21  Q.  Did you ask him to repeat the information to you?

22  A.  I did, several times.  He provided the same information

23  each time.

24  Q.  During the course of this encounter, can you describe

25  what Mr. Rush's demeanor was?

1    A.  He was acting extremely nervous.  He was fidgeting around

2    in the car.  He kept reaching down below the seat.  Kept

3    moving around so we then asked him to step out of the vehicle

4    and made a patdown for officer safety to make sure he didn't

5    have any weapons on him.

6    Q.  Who conducted the patdown?

7    A.  My partner did.

8    Q.  Did you observe Mr. Rush do anything else while you were

9    there for the traffic stop?

10   A.  While he was standing outside the vehicle he kept looking

11   around.  He would stare down the street, looked to the right,

12   looked to the left.

13   Q.  Based on your experience as a patrol officer, what did

14   that indicate to you?

15   A.  That indicated to me that he was about to run, which he

16   did.

17   Q.  What happened when he ran?

18   A.  Well, when he ran I was sitting inside my vehicle with

19   Mr. Davis because he was in custody.  My partner was standing

20   out there with him.  Mr. Rush ran eastbound on Fairview

21   Avenue.  I got on the radio and broadcast a description and

22   the direction of travel.  And then I told my partner to go

23   ahead and get the female out, because at that time we didn't

24   know what she had on her.  If my partner had pursued him, she

25   could have had a gun and he could have been shot.

1  Q.  Eventually was Mr. Rush apprehended and brought back to

2  your vehicle?

3  A.  Yes, sir, he was a few moments later.  Unit three ten

4  apprehended him and then returned him to us.

5  Q.  Do you know if during the course of this apprehension the

6  officers conducted a search of Mr. Rush?

7              MS. CONNOR:  Objection, Your Honor.  He wasn't

8  there.

9              THE COURT:  Ask him if he knows.

10  A.  I'm pretty sure when we took him into custody they did,

11  because that's standard procedure to make sure he doesn't

12  have any weapons on him.

13              MS. CONNOR:  Your Honor, again I object.

14              THE COURT:  There is no question before him right

15  now.

16  Q.  Officer Warren, did -- what officers apprehended Mr.

17  Rush?

18  A.  It was Officer Butler and Officer Peterson.

19  Q.  Did Officer Butler or Officer Peterson hand you any

20  evidence for you to take into custody?

21  A.  Yes, they did.  They handed me five spent rounds of

22  ammunition.  When they returned to the scene, we finished

23  searching him, did a complete thorough search of him and

24  found some more rounds of live ammunition that matched the

25  ones inside the gun that we found and the ones that was found

1    under the seat.

2    Q.  Just to go back and take those item by item, you say you

3    conducted a further search.  What was that of, a vehicle or

4    of Mr. Rush?

5    A.  Both.

6    Q.  And where specifically -- Well first, talking about the

7    ammunition, you say additional ammunition was found.  Where

8    was the ammunition found?

9    A.  Up under the front passenger seat where Mr. Rush had been

10   sitting.

11   Q.  Who actually found the ammunition?

12   A.  My partner did, Officer Kovacic.

13   Q.  And you mentioned a gun.  Where was that gun found?

14   A.  In the glove box.

15   Q.  And, again, who found that gun?

16   A.  Officer Kovacic.

17   Q.  And was that gun loaded?

18   A.  Yes, sir, it was.  It had five live rounds inside of the

19   cylinder.

20   Q.  What caliber of pistol was it?

21   A.  Thirty-eight revolver, black in color.  The manufacturer

22   was a Rossi.

23   Q.  And the ammunition, what caliber was it?

24   A.  Thirty-eight caliber.

25   Q.  And the spent shell casings that were handed to you by

| | |
|---|---|
| 1 | Officer Peterson and Officer Butler, I'm not asking you what |
| 2 | they said about, but the spent shell casings that were handed |
| 3 | to you, what caliber were they? |
| 4 | A.  They were also the thirty-eight caliber matching the ones |
| 5 | found under the seat. |
| 6 | Q.  Did the additional search of the vehicle that your |
| 7 | partner conducted, did he find any other contraband? |
| 8 | A.  No, sir, just the bullets and the revolver. |
| 9 | Q.  Did he find any drugs? |
| 10 | A.  No, sir. |
| 11 | Q.  The items that were found, were they processed in some |
| 12 | way? |
| 13 | A.  Yes, sir, they were. |
| 14 | Q.  Were they given to you or to Officer Kovacic? |
| 15 | A.  They were given to me.  I impounded the gun and the |
| 16 | rounds. |
| 17 | Q.  What did he do with Mr. Rush after that? |
| 18 | A.  We transported him to the Detective Division, and after |
| 19 | being interviewed by detectives his real identity was |
| 20 | discovered. |
| 21 | Q.  Did you then run a check of his real identity? |
| 22 | A.  Yes, sir, I did, through N. C. I. C.  He did not have any |
| 23 | outstanding warrants, and he was currently on parole and a |
| 24 | convicted felon. |
| 25 | MR. SHEPHERD:  May I have one moment, Your Honor? |

```
 1              THE COURT:  You may.

 2              (Whereupon, Mr. Shepherd conferred with Mr. Speirs

 3  off the record and out of the hearing of the other courtroom

 4  participants.)

 5  Q.  Officer Warren, the vehicle that was stopped, in the

 6  front passenger seat -- Approximately what would be the

 7  distance between the glove box and the seat?

 8  A.  Normal sitting, I would say from probably from my chest

 9  area to this computer screen.  It was well within reach.

10  Q.  Can you estimate how many inches that might have been?

11  A.  Inches?  Probably two feet maybe.

12  Q.  And the seat itself, is it raised very high from the

13  floor, or is it very close to the floor?

14  A.  It's pretty close to the floor.

15  Q.  And in the vehicle was there a lot of trash in that front

16  passenger's seat compartment?  Were lots of things in the

17  floor?

18  A.  No, sir, not that I recall.

19              MR. SHEPHERD:  Your Honor, the Government has no

20  further questions at this time.

21              THE COURT:  Ms. Connor?

22                        CROSS EXAMINATION

23              BY MS. CONNOR OF STEVE SMITH:

24  Q.  Officer Warren, I'm Roianne Connor.

25              You did not -- You said that your partner patted
```

1    down Mr. Rush and did not find anything, did he?

2    A.  He didn't find a weapon on him, no.

3    Q.  Nor did he find any spent shell casings, did he?

4    A.  After he was returned back to the scene --

5    Q.  No, sir.  The first time that he was patted down, did you

6    find any spent -- did your partner find any spent shell

7    casings on him?

8    A.  Not that I recall, no, ma'am.

9    Q.  Okay.  And then after he ran is when you're alleging that

10   the spent shell casings were then located, is that correct?

11   A.  That's when they were returned to me, yes, ma'am.

12   Q.  You didn't locate them, did you?

13   A.  No, ma'am, I didn't.  I was in the car with the subject

14   in custody.

15   Q.  You never saw Chris Rush with a gun in his hand, did you,

16   sir?

17   A.  No, ma'am, I did not.

18   Q.  You never saw Chris Rush with the spent shell casings,

19   did you, sir?

20   A.  No, ma'am, I did not.

21   Q.  You never saw him with any ammunition, did you, sir?

22   A.  Yes, ma'am, I saw the bullets come out of his pocket.

23   Q.  Out of his pocket?

24   A.  When he was returned to the scene, yes, ma'am.

25   Q.  Well you just told me that you didn't see him with any

1    spent shell casings.

2    A.  I didn't see him with shell casings, but I saw him with

3    the live ones being removed from his pocket.

4    Q.  Did you go over a -- Did you write a statement with your

5    partner?

6    A.  Yes, ma'am.

7              MS. CONNOR:  Your Honor, may I approach?

8              THE COURT:  You may.

9    Q.  Officer Warren, can you identify that particular

10   statement, sir?

11   A.  Yes, ma'am.

12   Q.  Okay.  In that statement can you point out to me -- and

13   I've read it and I may have missed it, I'm fifty-five years

14   old and I can do things like that -- where it says that there

15   were live shell casings taken out of his pocket, sir?

16   A.  No, it doesn't say that.

17   Q.  No, sir, it does not say that, does it, sir?

18   A.  No, ma'am.

19   Q.  May I have that back?

20   A.  Yes, ma'am.

21   Q.  Thank you.

22              Officer Warren, this statement was made that night,

23   is that correct?

24   A.  Yes, ma'am.

25   Q.  That would have been when your memory was the freshest,

1    isn't that correct, when the statement was made?

2    A.  Yes, ma'am.

3    Q.  But there is nothing in the statement about ever taking

4    any live ammunition off of Mr. Rush, is there, sir?

5    A.  No, ma'am, there's not.

6    Q.  Okay.  And could you be mistaken, then, sir?

7    A.  That is possible.  That's been almost a year ago.  Yes,

8    ma'am.

9    Q.  So you could be mistaken that there was actually some

10   live ammunition taken off of him?

11   A.  It is possible.  I wouldn't rule it out, no.

12   Q.  But it wasn't in your statement at all, was it, sir?

13   A.  No, ma'am.

14   Q.  You took possession of the ammunition, you took

15   possession of the gun and the spent shell casings, is that

16   correct?

17   A.  Yes, ma'am.

18   Q.  And that's in the supply room, correct?  Is that where

19   you all impound?

20   A.  Yes, ma'am at headquarters.

21   Q.  Did you ever submit any of these items for fingerprint

22   analysis, sir?

23   A.  Yes, ma'am.  They were submitted.

24   Q.  Did you?

25   A.  No, I didn't.  I don't know who submitted them, but I

```
 1   know that they were submitted.
 2   Q.  Okay.  But you never submitted anything, did you, sir?
 3   A.  I just impounded the weapon and the rounds.
 4   Q.  And you never got back a fingerprint report directed to
 5   you, did you, sir?
 6   A.  No, ma'am.
 7            MS. CONNOR:  Nothing further.
 8            THE COURT:  Redirect, Mr. shepherd?
 9            MR. SHEPHERD:  No, Your Honor.
10            THE COURT:  Okay, thank you, Officer Warren.  You
11   play step down.
12            (Whereupon the witness, Steve Warren, stepped down
13   from the stand.)
14            THE COURT:  Call your next witness.
15            MR. SHEPHERD:  The Government calls Officer Tim
16   Kovacic.
17              T I M O T H Y   K O V A C I C,
18      the witness herein, having first been duly sworn or
19   affirmed to tell the truth, was examined and testified as
20   follows.
21                    DIRECT EXAMINATION
22              BY MR. SHEPHERD OF TIMOTHY KOVACIC:
23   Q.  Would you please state your full name for the record and
24   spell your last name for all of us, please.
25   A.  My name is Timothy Kovacic.  K-o-v-a-c-i-c.
```

1    Q.   And where do you currently work, Officer Kovacic?

2    A.   I work for the Montgomery Police Department.

3    Q.   And how long have you been employed there?

4    A.   One year.

5    Q.   Prior to coming to Montgomery do you have any other law

6    enforcement experience?

7    A.   I spent twenty years in Texas as a police officer.

8    Q.   And where was that?

9    A.   In San Antonio.

10   Q.   And what's your current duty with the Montgomery Police

11   Department?

12   A.   I work Patrol on the third shift, which is seven-thirty

13   at night until six-thirty in the morning.

14   Q.   When you were in Texas, what duties did you perform

15   there?

16   A.   Well the last four years I was bike patrol downtown on

17   third shift.

18   Q.   And currently are you still working third shift?

19   A.   Yes, sir.

20   Q.   On April twenty-fourth of two thousand and seven were you

21   also working on patrol on third shift?

22   A.   Yes, sir.

23   Q.   Were you on patrol with anybody that night?

24   A.   Yes, sir.

25   Q.   Who was that?

1  A.   That would be Officer Warren.

2  Q.   And is he somebody you regularly patrol with?

3  A.   Yes, sir.

4  Q.   What kinds of things would you be doing while on

5  patrol?

6  A.   Mostly answering calls, but between answering calls we do

7  proactive police work.  Checking buildings and churches for

8  burglars, traffic, stopping people for traffic violation.

9  Q.   On the night of April twenty-fourth, two thousand seven

10  did you conduct a traffic stop on a vehicle driven by a Mica

11  Davis?

12  A.   Yes.

13  Q.   Can you describe what happened and why you made that

14  stop?

15  A.   Officer Warren was driving, and we were on Fairview

16  Avenue, and he observed a vehicle with a broken taillight.

17  And we conducted a traffic stop on the vehicle, and the

18  vehicle pulled into a service station here on Fairview that's

19  open all night long.  The driver did not have a driver's

20  license, and the passenger, the front seat passenger, Mr.

21  Rush, did not have any I D.  And the lady in the back seat,

22  female in the back seat did not have any I D.

23  Q.   What kind of car were they driving?

24  A.   It was a green Chevy Malibu.

25  Q.   And you said Officer Warren was driving.  When a traffic

```
 1   stop was made, what did you personally do?  Did you stay in
 2   the vehicle, or did you go out and get out on one particular
 3   side of the vehicle?
 4   A.   When we stopped the vehicle, Officer Warren approached
 5   the driver's side, and as the cover officer I approached the
 6   passenger side.
 7   Q.   What did you do when you got out to the passenger side?
 8   A.   I watched the other people in the car to make sure there
 9   was no weapons or there's not going to be any attack against
10   us.
11   Q.   And the passenger -- Can you describe what the demeanor
12   of the passenger was while you were up there by the car?
13   A.   The front seat passenger?
14   Q.   That's correct, the front seat passenger.
15   A.   In the beginning it was just a normal traffic stop.  None
16   of the people in the vehicle had an I D.  But as the time
17   went on and we began to try to identify the subjects in the
18   car, the front seat passenger became visibly nervous and
19   agitated as time went on.
20   Q.   What do you mean by that, what types of things was he
21   doing?
22   A.   Just fidgeting and evasive answers to questions.  Just
23   looked uncomfortable.
24   Q.   Did he give you his name?
25   A.   He gave us a false name.
```

```
 1   Q.   How many times did you ask him for his name?

 2   A.   Multiple times.

 3   Q.   And did he give you that same false name each time?

 4   A.   Each time.

 5   Q.   At some point did you remove him from the vehicle or ask

 6   him to step out of the vehicle?

 7   A.   Yes, sir.  He was removed from the vehicle.

 8   Q.   What did you do when you removed him from the vehicle?

 9   A.   Officer Warren took him to the rear of the vehicle and

10   patted him for weapons for officer safety.

11   Q.   Who conducted the patdown of the passenger?

12   A.   Officer Warren.

13   Q.   And at that point was anything found on that passenger?

14   A.   No, sir.

15   Q.   Then what happened after that?

16   A.   The -- Officer Warren took the driver back to the patrol

17   car and ran him for warrants on the laptop.  And the driver

18   came back with multiple warrants.  He had eleven warrants

19   from the City of Montgomery and a suspended or revoked

20   driver's license.  And Officer Warren was not able to verify

21   the name of Mr. Rush on the computer, which is in itself

22   unusual because normally you can find anybody in the computer

23   that's lived in Montgomery for any time.

24         So we both pretty much understood that he was

25   giving a fake name, because otherwise we would have found
```

1    something on him in the computer.

2    Q.  What did Mr. Rush do at that point?

3    A.  At this point -- He was still outside the vehicle, at

4    this point, and Officer Warren was back inside the patrol car

5    at the computer and the driver was back with him either

6    secured in the back seat or in the vehicle with him.  The

7    female passenger was still in the back seat of the Malibu.

8           And Mr. Rush was becoming more agitated as time was

9    passing while we were waiting trying to confirm his identity.

10   He became more visibly upset, and I picked up on this and

11   before I could make any move or secure him or anything, he

12   took off running between the car and the gas pumps.  And as

13   he ran by them, he hit the gas pumps with his arm or his leg

14   and almost fell and continued running down Fairview.

15   Q.  What did you do then?

16   A.  At that point I made eye contact with my partner to let

17   him know that the subject had taken off.  Officer Warren put

18   out a description and the direction of flight, and I stayed

19   at the scene with the -- since there was another person in

20   the vehicle, I didn't want to leave the scene.

21          I also checked -- I reached underneath the seat and

22   felt around underneath the front passenger seat to see why he

23   would take off running.  There must be a reason for him to

24   take off running.  So I felt under the seat, but I didn't

25   find anything at that point.

1  Q.  What happened after that?

2  A.  It was within about five minutes, another unit was close,

3  and they heard the description and took Mr. Rush into custody

4  a few blocks down the road and brought him back to the scene.

5  But at this point I checked more thoroughly in the vehicle.

6  I actually got down on my knees and looked underneath the

7  seat, and I saw several live rounds, thirty-eight caliber

8  rounds in the well underneath the seat, the front passenger

9  seat.

10  Q.  What else did you find?

11  A.  At that point I realized there could be a weapon with

12  these rounds, and I looked in the glove box and there was a

13  five shot thirty-eight caliber revolver loaded in the glove

14  box.

15  Q.  The glove box, was it locked in any way?

16  A.  No, sir.

17  Q.  If you could describe the interior of that car, how far

18  was that glove box from the passenger seat?

19  A.  It's not a large car, so it was within arm's reach.

20  Q.  And where you found the live rounds under the seat, how

21  far would that be for somebody sitting in the passenger's

22  seat?

23  A.  Well, they were in a well, a sunken in part of the carpet

24  so they could have been reached from the front.

25  Q.  Did you find any other trash or obstructions on littering

1    the floor of that front passenger compartment?

2    A.   I don't recall.

3    Q.   Did you find any other contraband during your search?

4    A.   No, sir.

5    Q.   And what caliber were the rounds that you found?

6    A.   Thirty-eight.

7    Q.   Officer Kovacic, how many rounds, total, did you find?

8    A.   I think there were twelve, total.

9    Q.   Would that include the rounds that you found in the

10   firearm as well?

11   A.   Yes, sir.  Five in the firearm.

12   Q.   And what did you do with those rounds after you found

13   them?

14   A.   Ultimately they were impounded as evidence at the police

15   department.

16   Q.   Did you impound them yourself?

17   A.   No, sir.

18   Q.   Who did?

19   A.   Officer Warren.

20            MR. SHEPHERD:  Your Honor, may I approach the

21   witness?

22            THE COURT:  You may.

23   Q.   Officer Kovacic, I just handed you what's been previously

24   marked as Government's exhibit one for identification.  What

25   have I handed you?

1   A.   You've handed me twelve thirty-eight caliber pistol

2   rounds.

3   Q.   And there was also a manila envelope or packaging?

4   A.   Yes, sir.

5   Q.   The rounds I just handed to you, are those the same

6   caliber as the rounds that you found on that night?

7   A.   Yes, sir.

8   Q.   Are they the same number of rounds that you found?

9   A.   Yes, sir.

10   Q.   The packaging I handed you with it, is that the same

11   manila envelope that you would put those rounds in when you

12   impounded them?

13   A.   Yes, sir.

14   Q.   Is there a number or anything on the envelope which would

15   identify as having been impounded with the Montgomery Police

16   Department?

17   A.   Yes, sir.

18   Q.   As far as you can remember, is that the same number that

19   corresponds to the impound number?

20   A.   Yes, sir.

21   Q.   The rounds, are they in the same or do they appear to be

22   substantially in the same condition as the night you found

23   them?

24   A.   Yes, sir.

25   Q.   And if you look at the rounds, can you identify what

1    manufacturer they were?

2    A.   Winchester.   I can't see too well.

3    Q.   Is Winchester the brand of the rounds you found, or among

4    the rounds you found that night?   Is Winchester consistent

5    with the rounds you found that night?

6    A.   Yes, sir.

7    Q.   Do those appear to be the same rounds you found and

8    impounded on the night of October twenty-fourth, two thousand

9    seven?

10   A.   Yes, sir.

11         MR. SHEPHERD:   Your Honor, the Government moves to

12   admit Government's exhibit one for identification.

13         MS. CONNOR:   Your Honor, we would object.   He

14   didn't do the impounding.   That was done by the other

15   officer, and I believe it would have been proper for him to

16   have testified but this officer actually did not sign the

17   impound sheet or actually give them to the --

18         THE COURT:   Overruled.   He's personally identified

19   them.

20         MR. SHEPHERD:   Your Honor, may I approach again?

21         THE COURT:   You may.

22   Q.   Let me retrieve the live rounds first.

23         Officer Kovacic, I just handed you Government's

24   exhibit two for identification.   What have I handed you?

25   A.   You handed me a blue steel five shot thirty-eight caliber

```
1   Rossi revolver.
2   Q.  And examining that weapon, is that the same weapon or
3   does it appear to be the same weapon that you seized on the
4   night of October twenty-fourth, two thousand seven?
5   A.  Yes, sir.
6   Q.  Is there anything about it that allows you to make that
7   identification?
8   A.  I remember the weapon.
9   Q.  Is it the same color and caliber?
10  A.  Yes, sir.
11  Q.  Is it the same make and model?
12  A.  Yes, sir.
13          MS. CONNOR:  Object to the leading, Your Honor.
14          THE COURT:  Overruled.  Let's get the gun in.
15          MR. SHEPHERD:  Your Honor, the Government moves to
16  admit Government's exhibit two for identification.
17          MS. CONNOR:  Your Honor, again, we would object.
18          THE COURT:  Officer, you took this gun out of the
19  glove box of the car yourself?
20          THE WITNESS:  Yes, sir.
21          THE COURT:  Overruled.  It's admitted.
22  Q.  Again, Officer Kovacic, the firearm in your possession is
23  what caliber?
24  A.  Thirty-eight.
25  Q.  And what were the caliber of the rounds that you found
```

1    under the seat?

2    A.   Thirty-eight.

3    Q.   Officer Kovacic, before Mr. Rush ran, you testified a

4    patdown search was conducted?

5    A.   Yes, sir.

6    Q.   At that time was anything found in his pockets?

7    A.   No, sir.

8    Q.   If you could explain, please, what purpose of a patdown

9    search such as was conducted on Mr. Rush.

10   A.   A patdown search is a limited search that's allowed for

11   officers to search for weapons or -- or weapons that could

12   harm the officers or other people at the scene.  It's not a

13   complete search.  It's not where you go into people's pockets

14   and pull everything out.  It's a limited search on the outer

15   clothing called a "patdown" for metal things from your

16   training and experience that you would know could be a

17   weapon.

18   Q.   How quickly can you conduct a patdown?

19   A.   Well, it depends on the circumstances.  On this evening

20   it would be done not too quickly to be a thorough patdown.

21   Q.   Based on your recollection of that evening, if something

22   as small as a used shell casing were found in the pocket,

23   would you be surprised that that may have been missed on the

24   initial patdown?

25   A.   I would not be surprised if it was missed.  A shell

1    casing was missed.

2    Q.  And why is that?

3    A.  Because a patdown search a limited search.  It's not

4    going into people's pockets and pulling small things out.

5    It's looking a handgun that's tucked into a waistband, or a

6    handgun that's tucked into a sock, or a knife that's tucked

7    into the waistband.

8    Q.  Finally, Officer Kovacic, what happened with the

9    defendant after he was brought back to your custody?

10   A.  The defendant was transported to headquarters and

11   interviewed by a detective.

12   Q.  Do you know, did he find out what his real identity

13   was?

14   A.  Yes, sir.

15   Q.  And did you or your partner run that name for warrants or

16   anything outstanding on him?

17          MS. CONNOR:  We would object, unless he was

18   actually there when it was run.  The other would be hearsay.

19          THE COURT:  The question is did he do it.  So I

20   assume did he do it is if he was there, so the objection is

21   overruled.  If he didn't do it he'll say.

22          You may answer the question.

23   A.  I did not run the subject for warrants.

24          MR. SHEPHERD:  No further questions, Your Honor, at

25   this time.

```
 1              I'd request permission to retrieve the exhibit
 2    since it is a firearm.
 3              THE COURT:  You may.
 4              Ms. Connor?
 5              MS. CONNOR:  Yes.
 6                           CROSS EXAMINATION
 7              BY MS. CONNOR OF TIMOTHY KOVACIC:
 8    Q.  Officer, how long was Mr. Rush seated in the front
 9    passenger area after the stop until you removed him?
10    A.  Maybe five minutes.
11    Q.  Okay.  And during that entire five minutes it was your
12    job to watch him, was it not?
13    A.  Yes, ma'am.
14    Q.  And while it was your job to watch him, you never saw him
15    put any bullets under the seat, did you, sir?
16    A.  No, ma'am.
17    Q.  You never saw him put a gun in the glove box, did you,
18    sir?
19    A.  No, ma'am.
20    Q.  Now you said that Officer Warren, when y'all took him out
21    of the car, did the patdown, is that correct?
22    A.  Yes, ma'am.
23    Q.  Well, would you be surprised if Officer Warren just
24    testified that you did the patdown?
25              (Whereupon, there was no response.)
```

```
1    Q.  Do you remember who did the patdown, sir?

2    A.  I do.

3    Q.  And who was that?

4    A.  Officer Warren.

5    Q.  You were a police officer for twenty years in San

6    Antonio, is that correct?

7    A.  Yes, ma'am.

8    Q.  Is it unusual, sir, for people that have previously been

9    charged with a crime or ex-felons to get really nervous when

10   they're stopped by the police?  That's not unusual, is it,

11   sir?

12   A.  No, ma'am.

13   Q.  And it's not unusual for ex-felons to give a relative's

14   name when they're stopped, is it, sir?

15   A.  No, ma'am.

16   Q.  When you do a patdown, Officer, you're feeling for metal,

17   aren't you, such as a knife?  A gun?  Some type of metal

18   object that can do harm, aren't you?

19   A.  Not entirely.  It could be a plastic knife.

20   Q.  Okay.

21   A.  We're looking for weapons.

22   Q.  All right.  If you felt metal or if you felt something

23   hard, wouldn't you have pulled it out of a pocket?

24   A.  If it felt like a weapon.

25   Q.  Officer, how long was Chris standing outside the car
```

1    before he ran?

2    A.   At least five minutes.

3    Q.   And when he ran, you said that he stumbled up against the

4    gas pump and you thought he was going to fall, didn't you?

5    A.   Yes, ma'am.

6    Q.   But he ran and another unit got him, didn't they?

7    A.   Yes, ma'am.

8    Q.   Y'all never found any live rounds on Chris, did you?

9    A.   No, ma'am.

10   Q.   And if Officer Warren said there were live rounds found

11   on Chris he was mistaken, wasn't he?

12   A.   I didn't find any live rounds on him.

13   Q.   You didn't find any spent rounds on him, did you?

14   A.   No, ma'am.

15   Q.   You never saw him put the gun in the glove box?

16   A.   No, ma'am.

17   Q.   You never saw him put the bullets under the seat in this

18   well that you're talking about, did you, sir?

19   A.   No, ma'am.

20   Q.   You never saw Chris with a gun in his hand at all, did

21   you?

22   A.   No, ma'am.

23            MS. CONNOR:  Nothing further.

24            THE COURT:  Redirect?

25            MR. SHEPHERD:  Yes, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  Redirect? |
| 2 | MR. SHEPHERD:  Yes, Your Honor. |
| 3 | REDIRECT EXAMINATION |
| 4 | BY MR. SHEPHERD OF TIM KOVACIC: |
| 5 | Q.  Officer Kovacic, from the time that the vehicle stopped, |
| 6 | how long did it take for you to get out of your patrol car |
| 7 | and get up to the front of the stopped car? |
| 8 | A.  I would say about a minute, plus how much longer it took |
| 9 | for us to give Dispatch our location. |
| 10 | Q.  When you pulled the vehicle over, were you able to see |
| 11 | inside the vehicle what the passenger in the front |
| 12 | passenger's seat was doing clearly? |
| 13 | A.  No, sir. |
| 14 | Q.  In your opinion, having seen the vehicle and where the |
| 15 | items were located, would there have been time for a person |
| 16 | sitting in that front passenger's seat to have deposited the |
| 17 | gun in the glove box and the bullets under the seat before |
| 18 | you arrived at the front window? |
| 19 | A.  From the time of the lights coming on? |
| 20 | Q.  That's correct. |
| 21 | A.  Yes, sir. |
| 22 | MR. SHEPHERD:  No further questions, Your Honor. |
| 23 | RECROSS EXAMINATION |
| 24 | BY MS. CONNOR OF TIM KOVACIC: |
| 25 | Q.  Officer, isn't it a fact that the driver exited the |

```
 1    vehicle as you came up to the passenger side?
 2    A.   I don't recall that.
 3    Q.   You don't recall that?  It could have happened?  It could
 4    not have happened, you just don't remember?
 5    A.   Your question?
 6    Q.   Did the driver -- Isn't it true that the driver exited
 7    the vehicle and was getting out of the vehicle when you
 8    walked up, is that correct?
 9    A.   I don't recall.
10              MS. CONNOR:  Nothing further.
11              MR. SHEPHERD:  No further questions, Your Honor.
12              THE COURT:  Okay.  May this witness be excused?
13              MR. SHEPHERD:  From the Government, yes.
14              MS. CONNOR:  From the Defense, yes.
15              (Whereupon the witness, Timothy Kovacic, stepped
16    down from the stand.)
17              MR. SPEIRS:  Your Honor, the Government would call
18    Joseph Peterson.
19                    J O S E P H    P E T E R S O N,
20        the witness herein, having first been duly sworn or
21    affirmed to tell the truth, was examined and testified as
22    follows:
23                         DIRECT EXAMINATION
24                    BY MR. SPEIRS OF JOSEPH PETERSON:
25    Q.   Good afternoon, sir.
```

1          If you would, please state your full name for the

2   record and just spell it for the court reporter, if you

3   would.

4   A.  Police Officer Joseph Frederick Peterson.

5   P-e-t-e-r-s-o-n.

6   Q.  What do you do for a living?

7   A.  I'm a police officer with the City of Montgomery.

8   Q.  And how long have you had that job, sir?

9   A.  Two years.

10  Q.  Would you briefly tell the ladies and gentlemen of the

11  jury what your duties are?

12  A.  I'm a third shift patrol officer between the hours of

13  eight and seven in the morning time.

14  Q.  How long have you had that job, sir?

15  A.  Two years.

16  Q.  What did you do before that?

17  A.  I was a contractor in Afghanistan.

18  Q.  And when you say a "contractor in Afghanistan," what did

19  you do?

20  A.  I was a personal security detail where we escorted

21  convoys between different army posts.

22  Q.  How long did you do that, sir?

23  A.  I did that for real close to two years.  Almost two

24  years.

25  Q.  And you are post certified, is that correct?

1    A.   Yes, sir.

2    Q.   What does that mean, "post certified"?

3    A.   It's a police officer standard training through the state

4    of Alabama.  They have a board that sets a criteria for

5    officers to be trained at.

6    Q.   So you passed all those exams and everything that it

7    takes to become a patrolman, is that correct?

8    A.   That's correct.

9    Q.   Sir, do you recall April twenty-fourth of two thousand

10   seven?

11   A.   Yes, sir.

12   Q.   All right.  Can you tell the ladies and gentlemen of the

13   jury what you were doing on that particular night.

14   A.   I was assigned to District Ten with a partner.  We were

15   doing routine patrol on the businesses.  It was later

16   evening.  We were dispatched to back up a unit that had a

17   subject flee from.  And we just got in the area because there

18   never where they're supposed to be.  We turned right down

19   Hill Street away from Fairview.

20   Q.   Let me stop you there.  You said they're never where

21   they're supposed to be.  I was a little bit confused by that.

22   What did you mean by that, sir?

23   A.   They're never within walking distance of the vehicle --

24   Q.   Who isn't?

25   A.   The subject that fled from the vehicle.

1  Q.  You're talking about folks running?

2  A.  Yes, sir.

3  Q.  Okay.  I understand.  Please go ahead.

4  A.  So we went into the area looking for the description that

5  had been put out over the radio.  We got two blocks north of

6  Fairview on Hill Street where we noticed a subject walking

7  that matched the description exactly.  He stopped, gave us a

8  blank stare.

9        We turned towards him and he began to run into a

10  yard where my partner pursued him.  Within half a block got

11  him in custody.  Brought him back to the car.  Patted him

12  down.  Found, I believe it was five rounds of thirty-eight

13  special spent cartridges in his pocket, and we placed him in

14  custody, took him back and he was identified.

15  Q.  Okay.  Let me stop you there.  Do you see in the

16  courtroom today the gentleman that you saw that night?

17  A.  Yes, sir.

18  Q.  Could you point him out, sir?

19  A.  The gentleman in the blue shirt.

20  Q.  Okay.  Did you later learn his identity?

21  A.  Yes, sir.  After we took him back to the unit that had

22  the subject flee from him, they identified him.  We

23  transported him to headquarters where he said he had a

24  medical condition, and we transported him to the hospital and

25  that's when we learned his true name and proper

1     information.

2     Q.   And who did you learn that he was?

3     A.   Mr. Rush.

4     Q.   Okay.  Let's talk about, if we can for a second, this

5     business about when someone is arrested, a patdown.  Can you

6     tell the ladies and gentlemen of the jury generally how that

7     works?  What a patdown is and how it works?

8     A.   A patdown is a police officer's safety to make sure there

9     is no weapons of any type or no contraband of any sorts that

10    he is not allowed to have in the back of a police vehicle

11    that could be a danger to myself or my partner.

12    Q.   Did you have the occasion to pat down the defendant in

13    this case, Mr. Rush?

14    A.   Yes, sir.

15    Q.   Tell us step by step how that happened.

16    A.   I start at the shoulders and work my way down.  When I

17    got to his pocket I felt the metal objects, and I pulled them

18    out to identify what they were and that's when I noticed they

19    were spent cartridges.

20    Q.   What pocket are we talking about?

21    A.   It was the right side pocket.  I'm not sure if it was the

22    front or the rear.

23    Q.   Now at some point he just didn't -- When you saw him he

24    didn't say oh, it's the police, I'm here.  What did he do

25    when you first saw him?

1  A.  When I first saw him he paused.  Just stopped walking

2  completely.  He gave us a blank stare like he was surprised

3  and then he gave a small foot pursuit.

4  Q.  Okay.  So can you tell us how it happened in the course

5  of events that you were able to pat him down?  At what point

6  did you pat him down?

7  A.  I patted him down after my partner had brought him back

8  to the vehicle because my partner was tired, per se, for

9  chasing the subject.

10 Q.  Okay.  So he was apprehended.  And if I understand your

11 testimony correctly, then he was brought back to the car and

12 then he was given a patdown, is that correct?

13 A.  Yes, sir, before placing him in the back of the police

14 car we always do a patdown.

15 Q.  Okay.  And if you would, tell me one more time kind of

16 how that works, if you would.  How does the patdown works.

17 A.  It's palms open.  Start at the shoulders and work our way

18 down on the subject.  That way it's systematic and

19 consistent.

20 Q.  And you were the officer that indeed gave the gentleman

21 the patdown, is that right?

22 A.  Yes, sir.

23        MR. SPEIRS:  May I approach, Your Honor?

24        THE COURT:  You may.

25 Q.  Sir, I'll show you what's been marked for identification

1    as Government's exhibit three.  If you would, take a look at

2    that exhibit, sir.  And if you would, after you've looked at

3    it, what's in that plastic bag?

4    A.  Five spent cartridges of a Winchester thirty-eight

5    special.

6    Q.  How do you know that?

7    A.  My military background in dealing with weapons and

8    knowing that the spent cartridge, what it looks like.

9    Q.  Okay.  Now do you recognize those particular

10   cartridges?

11   A.  Yes, sir.  These were the cartridges found on that

12   evening.

13   Q.  From who?

14   A.  From the pocket of Mr. Rush.

15   Q.  And how is it that you recognize them, sir?

16   A.  I removed them from his pocket myself.

17   Q.  And you recall that incident.  You recall seeing those

18   five shell cases, is that correct?

19   A.  Yes, sir.

20          MR. SPEIRS:  Your Honor, the Government would move

21   now move to admit Government's exhibit three.

22          MS. CONNOR:  No objection.

23          THE COURT:  Okay, they're admitted over no

24   objection.

25   Q.  Now, can you tell us -- You have some military training,

1   is that correct?

2   A.  Yes, sir, I do.

3   Q.  What's the difference between a live round and an

4   expended round?

5   A.  An expended cartridge is just the casing.  It has no

6   danger.

7   Q.  So let me ask you this.  There is no little bullet on the

8   top of here, is there?

9   A.  No, sir.

10  Q.  Okay.  So that means that somebody has pulled the

11  trigger, if you will.

12  A.  Yes, sir, that's been fired.

13  Q.  All right.  Now, sir, if you would look back at the

14  bottom of those particular cartridges, is there any kind of

15  little dents in the bottom back there?

16  A.  Yes, sir, they have been struck by the firing pin.

17  Q.  Struck by the firing pin.  So that means that at some

18  point in time they were put into a gun, is that right?

19  A.  Yes, sir.  The only way to make an indentation on the

20  primer is that the primer had been hit.

21          MR. SPEIRS:  Your Honor, may I approach again?

22          THE COURT:  You may.

23  Q.  Sir, I you what's already been put in evidence as

24  Government's exhibit two.  If you would, take a look at that.

25  Do you recognize that particular weapon?  What is that?

```
1   A.  It appears to be a thirty-eight special revolver produced
2   by Rossi.
3   Q.  Now, sir, let me make sure that we're clear about this.
4   You're not testifying that you ever saw that gentleman with
5   that particular gun, are you?
6   A.  No, sir.
7   Q.  All right.  And I'm interested in particular about this
8   part of the gun right here.  What is that?
9   A.  That is the cartridge that the chamber where the rounds
10  go into.
11  Q.  A chamber.  How many chambers are there on this
12  particular firearm, sir?
13  A.  There are five chambers.
14  Q.  Five chambers.  Now if I wanted to load that gun, what
15  would I do?
16  A.  You would drop the shell face down into the cartridge and
17  then pop it in.
18  Q.  And how many bullets would I have to put into that gun in
19  order for it to be filled up?
20  A.  Five.
21  Q.  Five?
22  A.  Yes, sir.
23  Q.  Okay.  How many rounds did you take off the defendant
24  from his back pocket?
25  A.  Five.
```

1   Q.   Five rounds?

2   A.   Yes, sir.

3   Q.   Based upon your training and experience as a military

4   man, are you telling us that the same number of rounds that

5   you found on the defendant are the exact same number of

6   rounds that would fit into the chamber of that gun?

7   A.   Yes, sir, I am.

8   Q.   Now, sir, we've also talked about, and these have already

9   been admitted into evidence, Government's exhibit one, these

10  are twelve rounds of -- I think they have a bullet on the top

11  so they would be live rounds of ammunition, is that

12  correct?

13  A.   Yes, sir.

14  Q.   Now, sir, you're not telling this jury that you ever saw

15  this defendant with live ammunition, correct?

16  A.   No, sir.  The only ammunition I saw the subject with was

17  spent cartridges.

18  Q.   All right.  And that's where there is no bullet left in

19  there, right?

20  A.   Correct.

21  Q.   Okay.  Now once you patted him down, what did you do with

22  him once he was in custody?

23  A.   He was placed into investigative custody in the back of

24  the patrol car, taken back to the scene where he fled from.

25  He was identified, and then taken down for further

1    questioning to police headquarters.

2    Q.  Okay.  When you took him back to the other patrol officer

3    and you said identified him, what does that mean?

4    A.  That means the officers who saw the subject flee were

5    able to put their eyes directly on the subject and identify

6    him.

7    Q.  Okay.  And just so we're very clear about this, you never

8    saw this gentleman flee from the original patrol car,

9    correct?

10   A.  That's correct.

11   Q.  All right.  You didn't see that.  And if there's been

12   testimony about the fact that he gave a false name, you

13   wouldn't know anything about that either.

14   A.  No, sir.

15   Q.  You weren't there for that?

16   A.  No, sir.  He didn't give us any information at the time

17   of apprehension.

18   Q.  Okay.  But if I understand your testimony correctly, when

19   you first saw him after hearing it over the radio, it gave

20   you, I think you said doing a headlight look, right?

21   A.  Yes, sir.

22   Q.  And then he started to scoot, too?

23   A.  Yes, sir.

24          MR. SPEIRS:  No further questions right now, Your

25   Honor.

1          THE COURT:  Ms. Connor?

2                CROSS EXAMINATION

3          BY MS. CONNOR OF JOSEPH PETERSON:

4    Q.  Officer Peterson, you're not a ballistic expert, are you,

5    sir?

6    A.  No, ma'am.

7    Q.  And you can't tell these ladies and gentlemen of the jury

8    that those five rounds were shot from that weapon, can you,

9    sir?

10   A.  No, ma'am.

11   Q.  All you can say is that you found -- your testimony is

12   you found these rounds in his pocket, is that correct?

13   A.  Yes, ma'am, that's correct.

14   Q.  Are you aware that there was a prior patdown in which

15   these alleged rounds were not even located?

16   A.  No, ma'am, I'm not aware of that.

17   Q.  Okay.  And you can't tell these ladies and gentlemen that

18   you ever saw him with a gun, can you, sir?

19   A.  No, ma'am.

20   Q.  You never saw him with a live ammo, can you, sir?

21   A.  No, ma'am.

22   Q.  You can't testify that those bullets were shot from that

23   gun, can you, sir?

24   A.  No, ma'am.

25   Q.  All you can testify to is that y'all found him, and that

1    you took -- the testimony is that you took the ammunition or

2    the spent rounds from his pocket, is that correct?

3    A.   That is correct.

4    Q.   And you never saw him shoot the gun, did you?

5    A.   No, ma'am.

6    Q.   And those spent rounds can't hurt a soul, can they?

7    A.   No, ma'am.

8    Q.   Nothing further.

9             MR. SPEIRS:  Very brief redirect, Judge.

10                       REDIRECT EXAMINATION

11               BY MR. SPEIRS OF JOSEPH PETERSON:

12   Q.   Sir, you have been a police officer for how long?

13   A.   Two years.

14   Q.   In the course of your training and experience, is it

15   possible that a police officer can make a mistake?

16   A.   Yes, sir.

17   Q.   All right.  Is it possible that during a patdown you

18   might miss something?

19   A.   Yes, sir.

20             MR. SPEIRS:  No further questions, Judge.

21             THE COURT:  May this witness be excused?

22             MS. CONNOR:  Yes, sir.

23             (Whereupon the witness, Joseph Peterson, stepped

24   down from the stand.)

25             MR. SPEIRS:  Your Honor, we have two or three more

1    witnesses.  Might I approach real quick with counsel?

2              THE COURT:  Sure.

3              (Off-the-record bench conference held.)

4              THE COURT:  Ladies and gentlemen, we're going to

5    take about a ten minute break here.  Be back and ready to go

6    at three o'clock.

7              I'll give you that instruction now.  You are not to

8    discuss the case with anyone, and avoid all contact with

9    trial participants.  That doesn't mean Ms. Roy now or the C.

10   S. O., but the lawyers and any witnesses that you might see

11   and the defendant.  Avoid any contact with them and don't

12   discuss the case with anyone, including each other.  And

13   we'll see you back in here at three o'clock.

14             (Whereupon, a recess was taken.)

15                       BENCH CONFERENCE:

16             MS. CONNOR:  During the break, I discussed with my

17   client the stipulation of the gun moving in interstate

18   commerce as well as admitting his priors.  And he has agreed

19   that we can stipulate that the gun was moving in interstate

20   commerce, and that he does have the two priors.

21             THE COURT:  Is that your recommendation to him?

22             MS. CONNOR:  That was my recommendation to him.

23   But I would like the Court to get him up here and have him

24   agree to the stipulation.

25             THE COURT:  Okay.

         MR. SPEIRS:  Judge, with those stipulations the
Government still has a couple of caveats.  One is we Ron
McCoy, Montgomery County Sheriff's Department, is a latent
print expert.  We will not be proving up the prior
convictions because of the stipulation, however what we would
like to do is have Officer McCoy talk about the science of
latent prints and the different environmental factors that
can go into the recovery of latent prints.

         I think it's important.  Ms. Connor, in opening
statements, talked about the fact that no latent prints were
covered and some of those issues, and I think it's important
to tell the jury that in many instances latent prints are
never recovered, depending upon environmental conditions.
She's also willing to stipulate to the firearm and ammunition
travel in interstate commerce.

         I do have Theron Jackson, who is an expert in
identifying ammunition, and the key to this case is I have
five Winchester rounds, and I've also got other rounds that
are Winchester rounds that were pulled from the gun.  And I
would like for him to be able to talk about those are
consistent brands.  With his training and knowledge of
firearms, that is consistent to the five rounds that were
found on the defendant.  Actually, thirty-eight caliber
rounds would fit a thirty-eight caliber handgun.  I think he
has, as an A. T. F. agent, has the knowledge and expertise

1    and training to talk about that.

2              MS. CONNOR:  As to Ron McCoy, Ron didn't dust this

3    gun.  He didn't lift any prints.  It wasn't even submitted to

4    him to do any fingerprint analysis.

5              THE COURT:  But he wants to testify to the science.

6    Did you raise that in the opening?  So I'll let the science

7    in on it.

8              Now what's this about thirty-eight?

9              MS. CONNOR:  Yeah, I don't understand.  I guess I'm

10   dumb.

11             MR. SPEIRS:  Judge, I'll try to say it better.

12   Obviously not having jurors that are perhaps gun savvy,

13   Judge, that I have an A. T. F. expert that will talk about

14   the fact that I have spent thirty-eight caliber rounds that

15   fit a thirty-eight caliber handgun, that are consistent with

16   live thirty-eight caliber rounds that are found under the

17   seat.  And the fact they're all Winchesters is a link for

18   circumstantial evidence that all these things are linked

19   together, and it's more probable than not that if he is in

20   possession of thirty-eight caliber Winchester rounds,

21   thirty-eight caliber Winchester rounds are found under the

22   seat and thirty-eight Winchester rounds are found inside the

23   gun, Judge.  That is something I think the Government would

24   like to argue to the jury that they're consistent all the way

25   down the line.

```
 1              THE COURT:  You already have that in.  First of
 2   all, it's not proper for him to testify that's consistent as
 3   far as you stated it.  Secondly, you've already got all that
 4   evidence in, that they're the same kind for the same weapon,
 5   and I think that would just be excess evidence to that point.
 6   I don't see any expert coming in for Mr. Jackson on that
 7   point.  But I will allow the explanation of the absence of
 8   prints.
 9              MR. SPEIRS:  Yes, sir, Judge.
10              THE COURT:  Anything else?
11              MS. CONNOR:  He said that he would stipulate to the
12   two prior convictions.  I just want him up here to confirm
13   that to the Court.
14              MS. CONNOR:  All right.
15              THE COURT:  Mr. Rush, would you come over, please.
16              (Whereupon, the defendant joined the bench
17   conference):
18              THE COURT:  Ms. Connor indicated to the Court that
19   you were willing to stipulate to fact that you have prior
20   felony convictions.  Is that correct?
21              THE DEFENDANT:  That's correct, sir.
22              THE COURT:  So you're taking her advice on that
23   matter?
24              THE DEFENDANT:  Yes, sir.
25              MS. CONNOR:  And we would stipulate that the gun
```

```
 1   being in interstate commerce.
 2            MR. SPEIRS:  And the ammunition.
 3            MS. CONNOR:  And the ammunition.
 4            THE COURT:  That's your understanding?
 5            THE DEFENDANT:  Yes, it is.
 6            THE COURT:  Okay.  Those will be accepted.
 7            MR. SPEIRS:  Thank you, Judge.
 8            (Whereupon, the bench conference was concluded.)
 9            THE COURT:  Okay.  Can you bring the jury in.
10            (Whereupon, the jury was escorted into the
11   courtroom.)
12            THE COURT:  You may all be seated.
13            Call your next witness.
14            MR. SPEIRS:  The Government calls Ron McCoy from
15   the Montgomery Sheriff's Department.
16                    R O N A L D    M c C O Y,
17      the witness herein, having first been duly sworn or
18   affirmed to tell the truth, was examined and testified as
19   follows:
20                    DIRECT EXAMINATION
21               BY MR. SPEIRS OF RONALD McCOY:
22   Q.  Good afternoon, sir.
23   A.  Good afternoon.
24   Q.  If you would, would you please state your full name for
25   the record.
```

1  A.   Ronald D. McCoy.  Ronald Delaney McCoy.

2  Q.  All right, sir.  If you would, would you just spell your

3  last name.

4  A.   M-c-C-o-y.

5  Q.  And, sir, how are you employed?

6  A.   I'm employed as an identification officer, fingerprint

7  examiner with the Montgomery County Sheriff's Department.

8  Q.  And, sir, we're just going to limit your testimony today

9  to latent prints.  Okay?

10  A.   Okay.

11  Q.  Sir, if you would, would you tell us a little bit about

12  your background, training and experience.

13  A.   Okay.  I started with the F. B. I. after finishing high

14  school in nineteen seventy-five.  I was employed with the F.

15  B. I. in Washington, D. C.  Started initially as a clerk.

16  Worked as a clerk for a couple of months and then I entered

17  fingerprint training with them.

18        It was about a four month five day a week class for

19  the initial portion of the training.  Then about six months

20  of on-the-job training in fingerprint comparison before you

21  were certified as a regular fingerprint examiner.  I worked

22  and was employed with the F. B. I. in D. C. for approximately

23  three years before I resigned and moved to Alabama and became

24  employed with the Alabama Bureau of Investigation.

25  Q.  All right, sir.  Sir, have you testified in court

1  before?

2  A.  Yes, I have.  I've testified in federal, circuit,

3  juvenile courts in Montgomery County.

4  Q.  Do you have any idea how many times you've testified as

5  an expert in the past?

6  A.  I testified in some form or fashion as to fingerprint and

7  fingerprint comparisons on average two to three times a

8  month.

9  Q.  And --

10 A.  That's over the years.  I have been employed between the

11 State and Montgomery County.

12 Q.  And, sir, how about any seminars, or publications, or

13 things of that nature that you keep current with?

14 A.  I've had additional type of training in my field.  Like I

15 said, I have my basic training with the F. B. I. in nineteen

16 seventy-five.  I received my initial latent training in

17 nineteen seventy -- I'm sorry, nineteen ninety-three with the

18 F. B. I.  And in addition to my basic latent training, I

19 received some advanced training with them in advanced latent

20 fingerprint comparisons in nineteen ninety-four and crime

21 scene photography classes with the F. B. I. in nineteen

22 seventy-five.

23       We had an A. F. I. S. system with the Montgomery

24 Sheriff's Department.  I received training in how to operate

25 the A. F. I. S. system in two thousand four.  It's N. E. C.

1    systems.  Received that through N. E. C. Solutions. They work

2    in conjunction with the F. B. I. for the compatibility with

3    the other type systems that we use.

4              I receive advanced palmprint comparison training.

5    Complex latent print examinations through I. A. I., the

6    National Association of Identification Officers in two

7    thousand six.  Complex latent print examinations through I.

8    A. I. in two thousand seven where we deal with, say, digital

9    different types of problems that you have with complex prints

10   where there may be different things of that type nature.

11             I've had forensic ridgology course with the

12   International Association of Identification Officers in two

13   thousand seven.  With that we studied not just the comparison

14   of say in a point type thing, you look at the ridges

15   themselves.  This is according to the structure of the ridges

16   of fingerprints.  You look at -- You take sweat pores into

17   consideration and things of that type nature.

18             I've also will training in two thousand seven in

19   digital latent print enhancement where we take poor quality

20   type print and extract the most minutia that we can receive

21   out of the images.

22   Q.  And, sir, for those of us who haven't had the benefit of

23   your training and experience, what exactly is a latent

24   print?

25   A.  Okay.  A latent print -- "Latent" within itself says it's

1    something that's left.  It's not visible to the naked eye.
2    When you look at the ridges on your hand, there actually --
3    your ridges are raised up and then you have the valleys and
4    grooves.  You have sweat pores that run along those ridges
5    also.  And when you touch an item and lift your hand up, the
6    hand is actually leaving an impression there but it's not
7    visible to the naked eye, and you're leaving a sweaty type
8    watery impression there.  And by the fact that it being
9    latent, you can't see it, something has to be done to bring
10   it out so that you can see it.
11   Q.  And, sir, typically on a crime scene how does someone go
12   about lifting a latent print, if you will?
13   A.  You would use some type of means of development; either
14   chemical, powder or photography.  There are a few occasions
15   where you may see -- say on a glass you may see some small
16   portion of this being visible.  So between one of those three
17   things, you use to bring it out to where you can see it
18   developing.
19   Q.  Yes, sir.  And you've talked about your years of training
20   and experience and your testimony in court.  Have you been
21   certified or been accepted by a court as a latent print
22   expert?
23   A.  Yes, I have.
24   Q.  Okay.  Do you offhand know how many times as a latent
25   print expert?

1    A.   On quite a number of occasions I've actually testified as

2    to the authenticity of latent prints.  I can't say exactly

3    how many, but quite a few times.

4    Q.   More than ten?

5    A.   Yes.

6           MR. SPEIRS:  Your Honor, at this time the

7    Government would offer Mr. McCoy as an expert in the latent

8    fingerprints.

9           THE COURT:  Any objection?

10          MS. CONNOR:  No, sir.

11          THE COURT:  Okay.

12   Q.   And you go by "Officer McCoy"?  How do you like to be

13   referred to as?

14   A.   Right.

15   Q.   Officer McCoy, do you see the gentleman seated over there

16   between Defense counsel?

17   A.   Yes, I do.

18   Q.   Sir, have you ever seen that gentleman before?

19   A.   Not before today.

20   Q.   All right, sir.  To your knowledge have you ever looked

21   at any kind of report, a latent print report regarding Mr.

22   Rush?

23   A.   No, I haven't.

24   Q.   So you wouldn't know whether he's ever touched anything,

25   would you?

1   A.   That's correct.

2   Q.   All right.   I want to talk to you a little bit about the

3   ability to pull prints off of various objects.   Do you

4   understand what I'm saying?

5   A.   Right.

6              MR. SPEIRS:   May I approach, Your Honor?

7              THE COURT:   You may.

8   Q.   I'll show you what's already been admitted into evidence

9   as Government's exhibit two.   If you would, would you take a

10  look at that, sir.   And it's a gun, correct?

11  A.   That's correct.

12  Q.   Sir, if you would, could you tell the ladies and

13  gentlemen of the jury what "blueing" is?

14  A.   "Blueing" is a type of finish that is applied to a weapon

15  to help prevent it from rusting.   As with touching it, and

16  the fingers would leave a sweaty residue.

17  Q.   Okay.   Does that particular firearm have blueing on it?

18  A.   Yes, it does.

19  Q.   Okay.   Can you tell us what the effect of blueing is on

20  your ability to pull a latent print?

21  A.   Creates some difficulty.

22  Q.   Why is that, sir?

23  A.   As what is left on there as far as what is done with the

24  blueing is to help prevent the sweat from messing a weapon

25  up.   And when you leave a print, you're leaving a sweaty

1  residue so that the blueing affects it.

2  Q.  You're saying it's not impossible?

3  A.  It's not impossible.  I'm not saying it's impossible.

4  That's just one of the factors that could affect it as far as

5  being able to obtain a usable latent print.

6  Q.  Yes, sir.  And if you would, would you describe the

7  handle of that particular firearm?

8  A.  It's a rubber type grip.  It's not a smooth surface.  It

9  had a lot of grooves in it.

10  Q.  Are you familiar with the term "checking"?

11  A.  I'm not familiar with that.  But you can see the checking

12  type of pattern on it.

13  Q.  Sir, if you would, can you tell us what that type of

14  grip, how that would affect your ability to pull a latent

15  print off that grip?

16  A.  In order to get a good, usable, latent print, I would

17  need a smooth surface.  And just by looking at this you can

18  tell it's not at all -- I couldn't get any continuity as far

19  as any of the ridge detail.  It would go just a little area

20  and then you'd have a break in there between all the

21  different checkers in there.

22  Q.  Okay.  And, sir, so we've talked about blueing, the fact

23  that that is a rubber grip on that particular pistol.  Can

24  you tell us about environmental conditions that might affect

25  the ability to pull latent prints?

1  A.  As far as the environmental conditions would go, it

2  depends on how the weapon had been handled by the individual.

3  You don't go around with a weapon out in the open.  If any

4  print or portion of a print was on the weapon in some area

5  and all, the way the weapon had been stored, the way the

6  weapon had been handled between when it was brought out or

7  whatever, could run any possible print off of it.  It has the

8  potential for doing that.

9         When you look at the surface, the type of surface

10  here, on the metal portion of the surface, this is not a type

11  surface where if you touched it and put a print on there it

12  soaks down into the weapon so it would be sitting on top of

13  the metal.  With that being the case, it has the potential,

14  depending on how the weapon was handled, if it brushes up

15  against anything, of rubbing that pattern away.

16  Q.  So that leads me to my next point.  Does friction may

17  have an impact on your ability to pull out a print?

18  A.  No, sir.

19  Q.  Can you describe that for me?

20  A.  Well, one thing that could cause what we were just

21  speaking of, some type of friction is how the weapon was

22  stored from the time it was found.  If it was secured in a

23  way where it wasn't moving around to where it would come into

24  contact with something else.  Anything that could potentially

25  come into contact with it could cause the transfer or rub

1   away the pattern or distort it in some way Officer, are you

2   familiar with weapons when they're found on the street, the

3   first order of business that a patrolman needs to do when he

4   comes upon a weapon he's not familiar with.

5           There's always a good principle for officer safety.

6   The first thing you want to do is secure that weapon.  You're

7   not necessarily concerned with how you get possession of it,

8   but you want to clear that weapon.  You want to take

9   possession of it and clear it.

10          The officer may or may not be wearing gloves.  Even

11  if he is, you are coming into contact with it.  And if he's

12  touching it, either with gloves on or without, he could be

13  touching it in an area where it may have been a genuine

14  appearance to begin with.  Whether it was usable or not no

15  one knows, but you're coming into contact with different

16  surfaces on the area.

17  Q.  Now you used an interesting term.  You said "clear the

18  weapon".  What does that mean?

19  A.  Making sure that the weapon is safe where it won't

20  fire.

21  Q.  And how do you do that?  How do you make sure that that

22  weapon is safe?

23  A.  By opening up, say, on this particular weapon, opening up

24  the chamber.

25  Q.  If I understand your testimony, is that the first order

1    of business to make sure that that gun is safe?

2    A.  That's the first order of business.

3    Q.  All right, sir.  If that gun was found in a glove

4    compartment, is there any environmental conditions or things

5    like friction that may affect the ability to pull a latent

6    print over that gun?

7    A.  It's a good possibility.  If it's found in the glove

8    compartment, that means you're talking about a vehicle.  If

9    the vehicle is being driven, it's bouncing around which would

10   be contact friction between it.  The potential is there.

11   Q.  All right, sir.  What about whether the gun or the

12   firearm itself is clean or dirty, does that make any

13   difference?

14   A.  Yes.  Clean or dirty, it affects -- Well, say if it was a

15   dirty weapon or an oily weapon, it could affect the patterns

16   as far as where the contact is made when the fingers coming

17   into contact with the weapon and all.  Too much, say in a

18   situation with dust or whatever, or dirt, that would dry out

19   the oily -- well the sweaty type pattern you would be leaving

20   on the print.  It wouldn't be as wet.

21   Q.  I see.  I see.

22   A.  You also have to take into account the condition of the

23   individual's hands that are coming into contact with it.

24   Q.  Could you explain that?  What does that mean?

25   A.  Well, everybody doesn't leave a good pattern.  You look

1    at the condition of whether there was dry skin, dry skin and

2    say just the average, any individual touching a surface, if

3    they have real dry skin they may not leave a usable pattern.

4    Versus somebody that sweats a whole lot would also leave a

5    pattern that wouldn't be good because they would be leaving

6    too much moisture.

7    Q.  I see.

8            MR. SPEIRS:  May I approach again, Your Honor?

9            THE COURT:  You may.

10   Q.  I'll show you what's already been admitted into evidence

11   as Government's exhibit three and as Government's exhibit

12   one.  There are twelve rounds of thirty-eight caliber

13   ammunition and five rounds of expended ammunition.  Officer

14   McCoy, would you perhaps instruct us on via your expert

15   knowledge on the ability to perhaps pull latent prints from

16   shells or shell casings?

17   A.  The potential is there.  But you're also dealing with

18   small items, also.  Sometimes you'll find fragments of

19   pattern on there, but it depends on whether you have enough

20   service area there, smooth service are to give you enough of

21   a pattern to make an identification on.

22   Q.  And, sir, you understand that to your knowledge none of

23   these items were ever submitted to you for a latent print,

24   and that's not what you're testifying to, is that correct?

25   A.  That's correct.

1   Q.  You're just testifying to your training and expertise in

2   this particular area?

3   A.  That's correct.

4   Q.  Sir, you talked about before clearing a weapon.  If a

5   firearm is loaded and you're out on the street, how would you

6   go about removing the live rounds?

7   A.  With this particular one, it appears that you would open

8   up the chamber and push the ammunition out.

9   Q.  Sir, would that action by itself potentially affect the

10  ability to recover prints?

11  A.  That's a good possibility.  Because I'm touching it in

12  the same area where, say, a person that had possession of it

13  prior to would touch it.  That would create a situation

14  potentially of prints on top of prints, making neither print

15  identifiable.

16  Q.  And, sir, just so I understand your testimony, you're not

17  saying that it's impossible, but you're saying that it's

18  difficult?

19  A.  That's right.

20  Q.  I see.  All right.

21          MR. SPEIRS:  Can I have one moment, Your Honor?

22          THE COURT:  Yes.

23  Q.  Officer McCoy, you don't know Mr. Rush, do you?

24  A.  No, I don't.

25  Q.  You were not out on the scene on the twenty-fourth of

```
 1   last year, were you?

 2   A.  No, I wasn't.

 3   Q.  You were not involved in a traffic stop with Mr. Rush,

 4   were you?

 5   A.  No, I wasn't.

 6   Q.  And you have not, to your knowledge, examined any latent

 7   prints that have to do with this gentleman?

 8   A.  I have not.

 9   Q.  Thank you, sir.

10            THE COURT:  Cross examination, Ms. Connor?

11                       CROSS EXAMINATION

12              BY MS. CONNOR OF RONALD McCOY:

13   Q.  Officer McCoy, you said it was difficult, say on the

14   cartridges, to pull a latent print.  But it's not impossible,

15   is it?

16   A.  It's not impossible.

17   Q.  And if someone, a forensic scientist had been a

18   ballistics expert had been doing it, they would be able to

19   pull something, wouldn't you believe that?

20   A.  You would pull something, but whether it was

21   identifiable --

22   Q.  This gun, you've never done any work with, have you?

23   A.  I have not.

24   Q.  And there were no latent prints submitted to you, I

25   understand?
```

```
 1   A.   That's correct.
 2   Q.   But to process this weapon would not have been an
 3   impossibility, would it?
 4   A.   That's correct.
 5   Q.   And if someone had even submitted it for processing, it
 6   could have been done, couldn't it?
 7   A.   Could have been processed?
 8   Q.   Yes.
 9   A.   That's correct.  It could have been processed.
10   Q.   Could have been processed.  And it could have been prints
11   pulled off of it, couldn't it?
12   A.   That's correct.  Some type of fragment or something could
13   have been pulled off.  You could have possibly found some
14   identifiable.  They may not always be the defendant, but you
15   could potentially find something.
16   Q.   We'll never know because that didn't happen, did it?
17   A.   It wasn't submitted to me.
18              MS. CONNOR:  Nothing further.
19              MR. SPEIRS:  Nothing further from this witness,
20   Judge.
21              THE COURT:  Okay.  Officer McCoy, you may be
22   excused.
23              (Whereupon the witness, Ronald McCoy, stepped down
24   from the stand.)
25              MR. SPEIRS:  Your Honor, may we approach briefly?
```

```
1              THE COURT:  Yes.
2              (Whereupon, an off-the-record bench conference was
3    held.)
4              THE COURT:  Ladies and gentlemen, we're working to
5    shorten the trial a bit.  There's a stipulation -- there are
6    two stipulations between the parties, which means that the
7    Government will not have to put on proof of these two
8    matters.  One is that this gun did travel and these bullets
9    did travel in interstate commerce.  You may know that a Rossi
10   is manufactured in Brazil, and I'm sure the shells are
11   manufactured somewhere outside Alabama.  So they did travel
12   in interstate commerce and the parties have stipulated to
13   that.
14             The defendant has also stipulated to his two prior
15   felony convictions which are mentioned in the indictment,
16   which is a kidnapping second degree in nineteen ninety-five
17   in Montgomery County, Alabama and theft of property first
18   degree in Montgomery County, Alabama nineteen ninety-five.
19   So those elements also will not have to be proved.
20             So we're near the end of the case.  And I need to
21   take up one other matter with the parties as to evidence
22   before the Government rests.  So I need to ask you all to
23   step out and it will be at least ten minutes.  So you'll get
24   at least a ten minute break.  I'll get back in here just as
25   quickly as we can.
```

1          Remember my instructions not to discuss this case

2    with anyone, even among yourselves.

3          (Whereupon, the jury was escorted out of the

4    courtroom, and the following colloquy ensued):

5          THE COURT:  We'll be in recess for about five

6    minutes while I look this over one more time, and you all

7    just be ready to go in about five.

8          MR. SPEIRS:  Yes, sir.

9          MS. CONNOR:  Yes, Your Honor.

10          (Whereupon, a recess was taken.)

11          THE COURT:  Is there any further argument from the

12    Government on the four oh four B proposed testimony?

13          MR. SPEIRS:  Judge, just that pursuant to the

14    research I've done on four oh four B, as the Court knows it

15    is a rule of inclusion, Judge, not a rule of exclusion.  The

16    defendant has put his intent central at issue, and I have a

17    situation where I have an eyewitness, the man had a firearm,

18    Judge, and I think that because he's denied in this case his

19    intent to possess a firearm, it is additional possession of

20    one via an eyewitness; it is more probative than prejudicial,

21    Your Honor.

22          THE COURT:  Ms. Connor?

23          MS. CONNOR:  Your Honor, when we look at four oh

24    four B evidence, we're looking at prior alleged bad acts.  I

25    have read the *Benny Herring* case, but I believe that what

1     they have there and what they had Mr. Herring with the gun,

2     the way that I read the two-page opinion.  I believe that by

3     allowing the four oh four B evidence, that it would be --

4     that it doesn't apply, that it is not a prior bad act if you

5     look at the dates.  Also it would lead to prejudice and

6     confusion of the issues, and I think it would be misleading

7     to the jury.  Therefore we ask that you deny their motion.

8             THE COURT:  Okay.  The Court has considered this

9     evidence under four oh three and four oh four B.  The Court

10    notes that the rule -- I don't think the rule says prior

11    acts, it just says "other acts," and I think that's been

12    pointed out perhaps in a case but not a case I read lately

13    that it does not necessarily have to be a prior act.

14            Nevertheless, in this case the Government proposes

15    to put in this evidence that occurred three or four months

16    after the event in question.  The Court is concerned about

17    that, as to how an incident post, after rather, the charge

18    made now would establish intent, prior intent.  The Court

19    thinks it would be more probative if it were an episode that

20    occurred before the offense that is charged.

21            The Court does not rest its ruling on that,

22    however.  The Court does find that the similarity of the

23    current offense -- there is a similarity of the current

24    offense to the extrinsic evidence to be offered, that the

25    Government has offered; that the amount of time separating

1    the two is within what would normally be an appropriate

2    amount of time, and of course in importance of intent in this

3    case is unquestioned.

4           Nevertheless, I'm not going to allow the evidence

5    because I think it is more prejudicial than it is probative

6    under the particular circumstances of this case.  So the

7    Government's motion is denied.  You have made a proffer in

8    your motion.  I would say for the record as I said earlier

9    that I would not have allowed the statement in of the

10   defendant at any rate, but I see this as being more

11   prejudicial than probative.

12          If you want to further your proffer to shore it up,

13   I suppose, in addition to what you put in your motion, I'll

14   allow the Government to do that at this time.

15          MR. SPEIRS:  Yes, sir, Your Honor.  I've talked

16   with the witness at the lunch hour.  She was in her -- she

17   and the defendant lived in close proximity to each other.

18   Apparently on the day in question there was a disagreement

19   with the witness's brother.  According to the witness

20   herself, the defendant came to her house and kicked the door,

21   either it was ajar or somehow gained entry into her

22   apartment.  She had been asleep at the time and she a minor

23   child there in the apartment with her.

24          She says that he held out the gun to her, pointed

25   it at her from a distance of maybe about seven to ten feet.

1   She saw the gun very clearly, Judge.  It was, I believe she

2   said, a chrome pistol.  Then the defendant noticed her

3   daughter, and that's when he left.  And, Judge, in talking

4   with the witness we would instruct the witness if it would

5   allay the Court's fear, that she would say nothing about any

6   statement that was made at the time, but purely to recount to

7   the jury that this man came into her home and pointed a gun

8   at her.

9           And, Judge, I think it is in the case law that I

10  have looked at, and I don't have one right in front of me

11  right now, that they are other bad acts.  I know the Court is

12  concerned about the kind of the timing of this, Judge, but I

13  think when the defendant has put his intent at issue in this

14  case, and we have another situation.  And as the *Cassell*

15  case, and I think it is instructive, Judge, and I don't mean

16  to read the case to the Court, but there was a passage that I

17  was looking at this morning, Judge.

18          "Prior history of an intentional possession

19  possessing guns, or for that matter any chattel of any sort

20  is certainly relevant to the determination of whether a

21  person in proximity to such a chattel on the occasion under

22  litigation knew what he was possessing and intended to do

23  so."  And, Judge, I believe that's at star (sic.) seven

24  ninety-five.  And that really is kind of the heart of the

25  Government's argument, Your Honor, that we have on this other

1    occasion the fact that he is possessing a firearm.

2            And a firearm is unique, Judge, other than "other

3    chattels," I would submit.  And especially when the offense

4    conduct in this case is a firearm.  And we have another

5    within a short period of time where he's got another gun and

6    points it at somebody and, Judge, we would limit her

7    testimony to the fact that she came into his house and

8    pointed a gun at her.

9            THE COURT:  Of course I'm not basing my ruling on

10   the relevance of it, but on the unduly prejudicial nature of

11   it.  But I did want to point out that you said she would

12   identify it was a chrome pistol, so it wouldn't be the pistol

13   here.  The pistol here had already been picked up.

14           MR. SPEIRS:  Correct, Judge.  So it's another

15   pistol which I think adds weight to the fact that he intended

16   to possess the pistol in this case.

17           THE COURT:  Okay.  That's my ruling, and that's the

18   basis for it.

19           MR. SPEIRS:  Thank you, Judge.

20           THE COURT:  Is the Government prepared to rest at

21   this time?

22           MR. SPEIRS:  Judge, that would be the sum of the

23   Government's case.

24           THE COURT:  All right.  I would expect that the

25   defendant is not going to put on any evidence?

```
 1              MS. CONNOR:  That is correct, sir.

 2              THE COURT:  All right.  Which means that the jury

 3    will be allowed to leave at this time because I want to give

 4    you all time to look at the charges.  So I'm going to release

 5    the jury for this afternoon, and I'll have them back in the

 6    morning so that they can get through their business tomorrow

 7    and give them time to vote.  None of them said they were more

 8    than an hour away from the courthouse.

 9              So if you would, go ahead and bring the jury back

10    in.

11              (Whereupon, the jury was escorted into the

12    courtroom.)

13              THE COURT:  Y'all may be seated.

14              Does the Government have any more witnesses?

15              MR. SPEIRS:  The Government rests at this time,

16    Your Honor.

17              THE COURT:  The defendant?

18              MS. CONNOR:  The defendant rests, Your Honor.

19              THE COURT:  So we have concluded the testimony in

20    this case.  Is that correct?

21              MR. SPEIRS:  That is correct, sir.

22              MS. CONNOR:  Yes, sir, it is.

23              THE COURT:  All right.  Ladies and gentlemen, I'm

24    going to release you for the day because we have to get ready

25    for the charge conference and for the argument of the case,
```

```
 1    which we'll do tomorrow morning at nine o'clock.  You need to
 2    be here sufficiently early to have doughnuts or whatever you
 3    want to take advantage of because I want to get started at
 4    nine.  It's a primary day, and I want to make sure we get you
 5    through in time to go vote.
 6             So you'll leave now with my instructions not to
 7    discuss the case or investigate the case in any manner, and
 8    among yourselves or with anyone else.  And if you would be
 9    back tomorrow ready to go at nine o'clock.
10             You're dismissed for the evening.
11             (Whereupon, the jury was escorted out of the
12    courtroom.)
13             THE COURT:  Okay.  Court will be in recess until
14    tomorrow morning at eight-fifteen.
15             We're going to E-mail you the proposed charges
16    hopefully about five o'clock if not sooner.  If y'all would
17    be prepared for a charge conference at eight-fifteen in the
18    morning, we'll get started.
19             MS. CONNOR:  May we be excused?
20             THE COURT:  You are excused, and we'll be in
21    recess.
22             (Whereupon, the proceedings were concluded)
23
24                       * * * * * * * *
25
```

1

2                    COURT REPORTER'S CERTIFICATE

3

4

5        I certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter as prepared by me to the best of

8    my ability.

9

10       I further certify that I am not related to any of

11   the parties hereto, nor their counsel, and I have no

12   interest in the outcome of said cause.

13

14       Dated this 29th day of May 2008.

15

16

17                        \s\ Mitchell P. Reisner, CM, CRR
                          **MITCHELL  P.  REISNER,  CM,  CRR**
18                        Official US Dist. Court Reporter
                          Registered Professional Reporter
19                        Certified  Real-Time  Reporter

20

21

22

23

24

25